798 F.Supp. 565 (1992)
HARVARD INTERIORS MANUFACTURING CO., Plaintiff,
v.
UNITED STATES of America and Richard G. Austin, Administrator, General Services Administration, Defendants.
No. 4:92cv00583-DJS.
United States District Court, E.D. Missouri, E.D.
July 16, 1992.
*566 Julia E. Sullivan, Andrew L. Sandler, Richard L. Brusca, Skadden and Arps, Washington, D.C., Jay A. Summerville, Armstrong and Teasdale, St. Louis, Mo., for plaintiff.
Edmund W. Chapman, General Services Admin., Office of Gen. Counsel, Washington, D.C., Joseph B. Moore, Edwin B. Brzezinski, U.S. Attys., St. Louis, Mo., for defendants.

MEMORANDUM AND ORDER
STOHR, District Judge.
Plaintiff, the low bidder on a government procurement contract for the purchase of chairs, was disqualified from consideration for award of the contract based on a finding that plaintiff was financially non-responsible; plaintiff brings suit challenging its disqualification under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq. The case was tried to the Court sitting without a jury. This Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, in accordance with Fed.R.Civ.P. 52(a).

Findings of Fact
1. Plaintiff, a division of Harvard Industries, Inc., is a furniture manufacturer located in St. Louis, Missouri.
2. In the fall of 1991, the General Services Administration ("GSA") accepted bids on Solicitation No. FCNO-91-J401-N-10-15-91 for a two-year requirements contract for the purchase of "Upholstered Style Shell Chairs" ("the Chair Contract"), to run from February 1, 1992 through January 31, 1994. The contract has an estimated value of $13 million.
3. At all times relevant, Harvard Industries was in a Chapter 11 bankruptcy proceeding.
4. Joseph Gross was the GSA Contracting Officer with responsibility for the award of the Chair Contract; GSA Contract Specialist Glenda Lambert assisted Gross with respect to the Chair Contract.
5. Plaintiff was the low bidder on the Chair Contract.
6. Standard Form 1403 is used by a GSA Contracting Officer to request a preaward financial survey on a prospective contractor from the GSA Credit and Finance Section ("Finance"), located in Kansas City, Missouri. The financial analyst who performs the survey also records his conclusions and remarks on the Form 1403.
7. On December 5, 1991, Gross requested a preaward financial survey on plaintiff with respect to its bid on the Chair Contract. Marc Winkler, a junior financial analyst, *567 received the request for and performed the analysis on December 6, 1991.
8. At some time in November, 1991, GSA Contracting Officer Helen Zivkoviche had requested a preaward financial survey on plaintiff with respect to a contract for stools ("the Stool Contract"). Winkler was the financial analyst assigned to that survey. When Winkler called Zivkoviche on November 21 with his preliminary conclusions concerning plaintiff's adverse financial position, Zivkoviche cancelled Winkler's evaluation. Plaintiff was awarded the Stool Contract on or about December 20, 1991.
9. The financial data used by Winkler in performing the preaward survey with respect to the Chair Contract was the data submitted by plaintiff within the prior month with respect to the Stool Contract. Winkler knew that the information had been submitted within a month of his use of it, and therefore deemed the information to be sufficiently up-to-date for his analysis of plaintiff with respect to the Chair Contract.
10. Using balance sheets provided by to Finance by plaintiff and dated September 30, 1991, Winkler calculated Harvard Industries' working capital to be a negative $312,030,000, tangible net worth to be a negative $142,677,000 and net earnings to be a negative $58,435,000.
11. In performing his financial analysis, Winkler also considered the report, dated February 1, 1991, of an independent audit of Harvard Industries submitted by plaintiff to Finance; the audit summary contained the statement that:
the Company's recurring losses from operations, its stockholders' deficiency and its noncompliance with substantially all of the financial covenants contained in its bank credit agreement and senior-subordinated debentures raise substantial doubt about the entity's ability to continue as a going concern at September 30, 1990.
Winkler also consulted a Dun & Bradstreet report on Harvard Industries, and considered plaintiff's tangible net worth, working capital, and sales projections as compared with other companies with a similar asset base in the same industry.
12. In performing his financial analysis, Winkler did not consider plaintiff's existing and previous government contracts, of which he was not aware. He did not seek to contact any of plaintiff's trade creditors, nor did he seek information concerning the necessity of capital expenditures for plaintiff's performance of the Chair Contract.
13. In performing a financial analysis, Finance's standard practice is to use only historical, rather than prospective, financial data and information.
14. At the time of his analysis, Winkler was aware of Harvard Industries' agreement in principle with its debenture-holders to convert $200 million in debentures, plus accrued interest, into equity securities. He was also aware of the availability of $35 million in debtor-in-possession financing to Harvard Industries, but did not consider that sum necessarily available to Harvard Interiors for use in performing the Chair Contract. In keeping with Finance's practice of considering historical financial data, Winkler did not give much weight to these prospective considerations in conducting his financial analysis.
15. Winkler wrote the following synopsis of his conclusions regarding plaintiff in the "Remarks" section of the Form 1403:
Based on the submitted financial data, this subject's finances appear too marginal for the satisfactory completion of this two year award at this time.
The year end financial statements reveal a moderate nine figure deficit in working capital and a low nine figure deficit in tangible net worth. The bidder suffered a medium eight figure net loss for the period ended.
Dun and Bradstreet reports the company filed for Chapter 11 bankruptcy in May of 1991. The subject is "blank" rated, condition is reported as "unbalanced," and trend as "down." A mixed trade payment history is reported.
Accordingly, we cannot recommend this bidder for this two year award at this time with regard to finances. If *568 additional financial support is offered or received, we will be happy to reevaluate this bidder at the request of the Contracting Officer.
16. Winkler considered the summary of his conclusions as recorded on the Form 1403 to be a "general analysis" as that term is used in Finance's internal procedures, found in Chapter 15 of the GSA Credit and Finance Operating Handbook. A general analysis recorded on the Form 1403 is Finance's standard practice in reporting their financial survey results to the requesting contracting officer.
17. The Form 1403 contains three choices for Finance's recommendation: complete award, partial award or no award. Winkler checked the box next to "no award" as his recommendation concerning plaintiff and the Chair Contract.
18. Winkler had previously recommended contract awards to companies in Chapter 11 proceedings.
19. Winkler's analysis and conclusions were reviewed and endorsed by senior financial analyst Mark Robinson on December 9. Such approval by a senior analyst was required under GSA procedures in view of Winkler's applicable "signatory authority limit" of contracts up to $10 million in value.
20. No Standard Form 1407, the preaward survey form specific to financial capability, was completed on plaintiff with respect to the Chair Contract. Form 1403 is a general preaward survey form. Box 21 on plaintiff's Form 1403 as completed by Winkler does not indicate whether it was intended as a short-form report in this instance.
21. It is standard for GSA National Furniture Center contracting officers requesting a preaward financial survey to submit only a Form 1403 to Finance for completion.
22. In making the final determination to disqualify plaintiff on the basis of non-responsibility, Gross considered, in addition to Finance's conclusions concerning plaintiff's adverse financial position, plaintiff's plant facilities report and past performance under government contracts. The past government contracts considered included a then-current chair contract, of which the Chair Contract here at issue is a continuation, under which GSA had received approximately 100 quality complaints.
23. In making the determination to disqualify plaintiff on the basis of non-responsibility, Gross had discussions with Lambert and the Division Director, Stephen Mial. These discussions included consideration of plaintiff's performance of other government contracts and the dollar values of those contracts, in addition to the preaward financial survey and no-award recommendation. All three agreed that plaintiff should be disqualified as financially non-responsible.
24. Finance's conclusions were the primary factor in Gross' final decision to disqualify plaintiff.
25. Plaintiff was informed of its disqualification for non-responsibility by a notice and letter signed by Gross and dated January 16, 1992. The letter was addressed to Chris Zaganelli, plaintiff's Manager of Contract Furniture, who received it on January 21, 1992.
26. By letter dated January 21, 1992 addressed to Gross, Zaganelli indicated plaintiff's interest in addressing GSA's concerns about plaintiff's ability to perform the Chair Contract. The letter reiterated plaintiff's existing government contracts and reviewed positive aspects of plaintiff's financial condition. The letter contains the following sentence: "Harvard Interiors is requesting at this time that consideration be given to keep [sic] negotiations open until the up-dated financial information from G.S.A. Finance in Kansas City is received and no formal award be made until this information is reviewed."
27. Also on January 21, prior to the drafting of Zaganelli's letter to Gross, Winkler had a telephone conversation with Joseph J. Gagliardi, Harvard Industries' Vice President in charge of Finance, in which Gagliardi indicated that plaintiff had at that time no new or additional documentation to submit concerning their finances.
*569 28. Gross declined to provide plaintiff with additional time in which to attempt to persuade GSA of its financial responsibility because he deemed the financial information provided by plaintiff to be current and accurate and the financial analysis alone to warrant plaintiff's disqualification as non-responsible. Gross conveyed the foregoing to plaintiff by a letter dated January 23, 1992, addressed to Zaganelli.
29. None of the other bidders on the Chair Contract on which a preaward financial survey was done was deemed by Finance to be financially non-responsible.
30. On January 24, 1992, the Chair Contract was awarded to Steelcase, Inc.
31. On January 27, 1992, plaintiff filed with the General Accounting Office ("GAO") a bid protest concerning the Chair Contract.
32. Pursuant to 31 U.S.C. § 3553(d)(1), performance of the Chair Contract was automatically stayed pending the outcome of the bid protest.
33. On March 23, 1992, the automatic stay was lifted pursuant to 31 U.S.C. § 3553(d)(2), based on a finding that resumption of contract performance would be in the government's best interest. Gross prepared the GSA "Determinations and Findings" announcing the lifting of the stay. Among the findings was the pendency of orders for 6,100 chairs.

Conclusions of Law

Standard of Review under the APA
Plaintiff makes both substantive and procedural challenges to GSA's actions in this case. The standard of review applicable to plaintiff's challenges under the APA is strict: The challenged agency action or determination is to be overturned only if it was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" or "without observance of procedure required by law." § 706(2)(A) & (D).
As for plaintiff's substantive claims, "[a]gency action is arbitrary and capricious only where it is not supportable on any rational basis." Brotherhood of Railway & Airline Clerks v. Burlington Northern, Inc., 722 F.2d 380, 381 (8th Cir.1983).
In considering whether the [agency] decision is arbitrary and capricious or an abuse of discretion, the ... decision will be upheld unless [the agency] failed to consider all relevant factors and articulate a rational connection between the facts found and the choice made.
Action, Inc. v. Donovan, 789 F.2d 1453, 1457 (10th Cir.1986). On the other hand, it is arbitrary and capricious "for an agency not to take into account all relevant factors in making its determination." Hanly v. Mitchell, 460 F.2d 640, 648 (2nd Cir.1972), quoted in National Black Media Coalition v. F.C.C., 791 F.2d 1016, 1024 (2nd Cir. 1986); see also Motor Vehicle Mfrs. Assn. v. State Farm Mutual, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Furthermore,
Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation of its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. SEC v. Chenery Corp., 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947). We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., [419 U.S. 281, 286 [95 S.Ct. 438, 442, 42 L.Ed.2d 447] (1974)].
Motor Vehicle Mfrs., 463 U.S. at 43, 103 S.Ct. at 2867.
As to plaintiff's procedural challenges: During the course of this inquiry, the reviewing court must be satisfied that the agency not only employed procedures which conform to the procedural requirements *570 of the Administrative Procedure Act [and other federal statutes] ..., but which also conform to the agency's own internal procedures ... "even where the internal procedures are possibly more rigorous than otherwise would be required."
Oglala Sioux Tribe of Indians v. Andrus, 603 F.2d 707, 713 (8th Cir.1979), quoting Morton v. Ruiz, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). Nonetheless, procedural irregularities justify judicial reversal of an agency decision only where they are both "clear and prejudicial." Irvin Industries Canada, Ltd. v. U.S. Air Force, 924 F.2d 1068, 1072 (D.C.Cir.1990); see also Smith & Wesson v. United States, 782 F.2d 1074, 1078 (1st Cir.1986).
The action under review is that of the contracting officer in disqualifying Harvard and awarding the contract to Steelcase, not of the Comptroller General on the bid protest. See Ensco Environmental Services, Inc. v. United States, 650 F.Supp. 583 (W.D.Mo.1986). Under 31 U.S.C. § 3556, however, the Comptroller General's decisions "shall be considered to be part of the agency record subject to review." Because § 3556 also provides that "nothing contained in this subchapter shall affect the right of any interested party ... to file an action in a district court....," the Federal Circuit has construed the statute as a whole to mean that the GAO decision on a bid protest is to be regarded as an expert opinion, "which [the court] should prudently consider but to which [the court has] no obligation to defer." Delta Data Systems Corp. v. Webster, 744 F.2d 197, 201 (D.C.Cir.1984).
Guided by the foregoing, the Court now rules on plaintiff's motion in limine, which was taken along with the case. At trial, the Court admitted defendants' Exhibits A through E subject to plaintiff's motion in limine to exclude them as irrelevant. Exhibit A is the Comptroller General's written decision on plaintiff's bid protest; this is admitted and considered in the nature of an expert opinion, in accordance with the discussion above. As to Exhibit A, then, the motion in limine is denied.
Defendants' Exhibits B through E comprise the "record" before the GAO, i.e., plaintiff's and defendants' submissions to the GAO on the bid protest. These exhibits are somewhat repetitive of other exhibits previously admitted, and, to the extent they contain "post hoc" efforts to expand or explain the contracting officer's decision and the rationale therefor, the Court considers them to be irrelevant to its narrow task under the APA. The Court therefore grants the motion in limine with respect to Exhibits B through E, except that the Court has considered defendants' Exhibit B only to the extent of the Peat Marwick independent audit report and Dun & Bradstreet report contained therein, as these were before Finance and used in the preaward financial survey.

Substantive Review
At trial, plaintiff's expert took issue with the financial analysis that led to Winkler's recommendation that plaintiff not be awarded the Chair Contract, specifically criticizing Winkler's reliance on historical data and failure to take into account the improved financial condition Harvard Industries would enjoy under its proposed reorganization plan. The expert's calculation of Harvard Industries' working capital, tangible net worth and net earnings, yielding positive results of eight and nine figures, took into account certain financial benefits associated with the bankruptcy reorganization, including the availability of debtor-in-possession financing, the proposed conversion of substantial debt into equity, the proposed reclassification of certain short-term debt into long-term liabilities, and the reevaluation of certain assets under "fresh-start" accounting principles.
In addition to disagreeing with Winkler's calculation of the financial factors he did consider, the expert stated the opinion that Winkler failed to consider certain other factors that would be relevant to a reasonable determination of non-responsibility, for example, a comparison of the prospective sales under the Chair Contract with plaintiff's overall sales, whether plaintiff would need to make additional capital expenditures in order to perform the Chair *571 Contract, whether plaintiff was satisfactorily performing under its existing contracts, and plaintiff's relationship with its trade creditors. In the expert's opinion, appropriate consideration of these additional factors strengthened her conclusion that plaintiff was in fact financially responsible.
The expert testified that she did not dispute the arithmetic basis of Winkler's calculations yielding negative figures for working capital, tangible net worth and net earnings; instead, the expert disagreed with Winkler's mode of analyzing the financial data provided by plaintiff and his failure to obtain and consider certain additional types of information. Plaintiff's challenge to Winkler's analysis has failed to persuade the Court that the analysis was arbitrary and capricious. Plaintiff has demonstrated that Winkler's analysis could have been more detailed and more sophisticated; plaintiff has failed to establish, however, that the analysis, and the resulting no-award recommendation, lacked a rational basis.
Harvard Industries' actual financial position, as revealed in the financial statements plaintiff submitted to Finance, was seriously adverse, as Winkler's calculations and conclusions indicated. Defendants established at trial that Finance's standard practice is to rely on historical data, and to give little weight to prospective projections, such as those relating to the proposed reorganization plan plaintiff would have had Finance consider. The Court is unwilling to categorically reject that practice as arbitrary and capricious, particularly as the evidence at trial indicated it has not resulted in the wholesale rejection of all prospective contractors involved in Chapter 11 proceedings.
Under the applicable standard of review, the Court is not called upon to determine whether plaintiff's expert was right, and Winkler wrong, concerning plaintiff's financial ability to perform the Chair Contract. Even if Winkler wrongly concluded that plaintiff was financially non-responsible, his error does not require overturning plaintiff's rejection unless GSA failed to consider all relevant factors and articulate a rational connection between the facts and the choice made. Plaintiff has, in the Court's view, failed to establish GSA's failure to consider any relevant factor, although plaintiff has made quite clear that it strenuously disagrees with the weight accorded certain pieces of information known by Winkler and given short shrift by him. The Court concludes that Finance's no-award recommendation based on financial non-responsibility was not arbitrary and capricious.
The Court separately considers the contracting officer's ultimate decision to disqualify plaintiff as financially non-responsible. The Court has found that, in making the final determination of non-responsibility, Contracting Officer Gross considered a plant facilities report on plaintiff and plaintiff's past performance under government contracts, in addition to Finance's analysis and conclusions. Nonetheless, Gross felt plaintiff's adverse financial condition outweighed the considerations in plaintiff's favor; the financial considerations were the primary factor in Gross' non-responsibility determination.
Having already concluded that Finance's conclusions were not arbitrary and capricious, the Court needs say little more to explain its conclusion that Gross' decision was not arbitrary and capricious either. Plaintiff has failed to meet its burden of demonstrating that Gross had no rational basis for his determination, or that he failed to consider some relevant factor. To the contrary, the Court deems Gross' reliance on the financial analysis conducted by the Credit and Finance Section to be reasonable, and Gross' disqualification of plaintiff to bear a rational connection to the financial recommendation on which Gross reasonably relied.
The Court further rejects plaintiff's allegation that Gross arbitrarily and capriciously failed to allow plaintiff an opportunity to persuade Gross that his financial non-responsibility determination was erroneous. The facts previously found by the Court indicate that after being notified of the disqualification, Harvard's Vice President of Finance indicated plaintiff had no *572 additional documentation it could then provide to substantiate its claims of financial responsibility. The Court is unpersuaded that Gross was obligated to wait for prospective financial developments to occur or to entertain arguments from plaintiff not supported by new financial data.
Finally, plaintiff has failed to meet the heavy burden of demonstrating that the decision to override the automatic stay of the Chair Contract during the pendency of plaintiff's bid protest was arbitrary and capricious. The pendency of orders for 6,100 chairs was a rational basis for the finding that the government's best interest would be served by the lifting of the stay.
For the foregoing reasons, and pursuant to 5 U.S.C. § 706(2)(A), the Court finds that GSA was not arbitrary or capricious in deciding to disqualify plaintiff from consideration for the Chair Contract on the basis of financial non-responsibility, deciding to award the Chair Contract to Steelcase without further delay, and deciding to override the automatic stay.

Procedural Review
A somewhat lengthy reproduction of applicable procedural provisions is necessary to a discussion of plaintiff's claims of procedural irregularity. Section 9.103 of the Federal Acquisition Regulations ("FAR"), found at 48 C.F.R. Ch. 1, provides in pertinent part:
9.103 Policy.
(a) Purchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only.
(b) No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility. In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility....
(c) The award of a contract to a supplier based on lowest evaluated price alone can be false economy if there is subsequent default, late deliveries, or other unsatisfactory performance resulting in additional contractual or administrative costs. While it is important that Government purchases by made at the lowest prices, this does not require an award to a supplier solely because that supplier submits the lowest offer. A prospective contractor must affirmatively demonstrate its responsibility....
The standards for responsibility within the meaning of the FAR are set out in § 9.104-1:
9.104-1 General standards.
To be determined responsible, a prospective contractor must
(a) Have adequate financial resources to perform the contract, or the ability to obtain them....;
(b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;
(c) Have a satisfactory performance record....;
(d) Have a satisfactory record of integrity and business ethics;
(e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them....;
(f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them....; and
(g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations.
Pursuant to § 9.106-1(a), the contracting officer is to request a preaward survey whenever "the information on hand or readily available ... is not sufficient to make a determination regarding responsibility." The contracting officer's authority to "limit the scope" of the preaward survey requested is found in § 9.106-2(e). Section 9.106-4(a) of the FAR indicates that preaward surveys should include completion of the "applicable" parts of Form 1403, the "General" form, and Forms 1404 through 1408, more specific surveys in the areas of technical capacity, production, quality assurance, financial capability and accounting systems. *573 GSA's Acquisition Regulations ("GSAR"), at 48 C.F.R. § 509.106-1(a) & (b), reference § 9.106-1(a) & (e) of the FAR with respect to whether and when a contracting officer should obtain a preaward survey and how he may elect to limit the scope of the survey requested. Section 509.106-2 of the GSAR provides that a contracting officer requests a preaward survey by forwarding to the "surveying activity" the Form 1403 and those "subparts" (i.e., Forms 1404 to 1408) he wishes to have completed. These FAR and GSAR provisions indicate that a contracting officer is not required to request any particular array of preaward surveys, but may instead tailor the surveys requested to his perceived need for information with which to evaluate the prospective contractor.
Section 1(d) of Chapter 1 of Finance's own internal procedures contains the following statement:
If contractor is disapproved as to finances, complete Financial Information Summary, sheet and preaward survey of Prospective Contractor Financial Capability, SF 1407 shall be prepared [sic].... The SF 1407 shall be forwarded to the contracting officer to support the turndown.
In the Court's view, the intended meaning of this ungrammatical provision is unclear. In particular, the Court is uncertain whether it would require the financial analyst to complete a Form 1407 whenever he recommends a finding of financial non-responsibility, even where the contracting officer has not requested that a Form 1407 be completed, as is his prerogative.
The most reasonable harmonization of the FAR, GSAR and Finance procedures would not require the completion of a Form 1407 by Finance unless one is submitted by the requesting contracting officer, and would not require the submission of a Form 1407 by the contracting officer unless he deems one necessary to his evaluation of a prospective contractor. This result is also in accordance with the standard practice of both GSA and Finance as indicated at trial and in the Court's findings of fact.
As indicated in the earlier discussion of the applicable standard of review, a procedural defect will warrant overturning the administrative decision upon judicial review under the APA only when the defect is both clear and prejudicial. Although plaintiff established at trial that no Form 1407 was completed with respected to plaintiff, the failure to complete a 1407 has not been shown to be a clear violation of the applicable procedures, given that Contracting Officer Gross submitted only a Form 1403 to Finance, and further testified at his deposition that "[t]he information provided on the 1403 is generally all we request." Gross Depo., p. 22, lines 20-21. Neither has plaintiff shown the lack of a Form 1407 to have worked substantial prejudice to plaintiff. In fact, the deposition testimony of GSA Contract Specialist Glenda Lambert, submitted by plaintiff at trial, contains the following:
It may not have been appropriate for them to use only form 1403; however, the outcome of the financial would have still recommended no award and, with the severity of the financial situation outlined on the 1403, we felt it was sufficient.
Lambert Depo. p. 64, lines 18ff. Even assuming that the failure to complete a Form 1407 was a violation of applicable procedures, this testimony would support a finding that plaintiff suffered no clear prejudice from that violation, because plaintiff would have been deemed financially non-responsibility even if a Form 1407 had been used.
Sections 4(d) & (e) of Finance's procedures provide a list of factors to be considered in the analysis of a prospective contractor's financial capability. "Major factors" include net worth, working capital, net sales, net income, fixed assets and debt profile. "Other factors" include, among others, additional financial backing, credit standing of the company, payment experience, requirements for additional capital equipment or inventory, cash position, judgments against the company, pending lawsuits, trends in sales and profit, performance on previous contracts and secured *574 financing. A distinction between general and detailed financial analysis is made in § 4(f) of Finance's procedures; the provision indicates circumstances in which a detailed analysis "should be done on SF 1403," including when there are "factors indicating a questionable or unsatisfactory financial position" or "factors such as negative net worth, negative working capital, and operating losses."
Plaintiff has failed to demonstrate that the financial analysis Winkler performed clearly failed to comply with these procedural guidelines to the substantial prejudice of plaintiff. As previously indicated, plaintiff disagrees with the weight given to various considerations in Winkler's analysis; nonetheless, plaintiff has not established that the analysis neglected to consider any crucial factor entirely, which consideration would likely have led to the opposite result. Furthermore, although Winkler himself characterized the summary of his analysis on the Form 1403 as "general," plaintiff has not shown how, as a procedural matter, it was prejudiced by Winkler's failure to record a more detailed summary of his unfavorable analysis.
Plaintiff also challenges the sufficiency of GSA's notice of non-responsibility. Section 9.105-2(a)(1) requires that:
When an offer on which an award would otherwise be made is rejected because the prospective contractor is found to be nonresponsible, the contracting officer shall make, sign, and place in the contract file a determination of nonresponsibility, which shall state the basis for the determination.
In this case, Contracting Officer Gross prepared a determination of non-responsibility indicating that the determination was being made in view of Finance's no-award recommendation "based on [plaintiff's] adverse financial position and the fact that [plaintiff is] operating in a nine figure deficit." See Joint Exhibit 5.
Although brief and undetailed, the determination does contain a statement of the basis for the finding of non-responsibility. The Court also notes that the applicable regulation does not require that the prospective contractor be furnished with a copy of the written determination or otherwise advised of the basis for the determination of non-responsibility. Whether or not the statement is sufficient to satisfy the regulation, plaintiff hasn't shown clear prejudice flowing from any such deficiency, particularly as the written determination appears not to be intended to serve as a notice to the prospective contractor, and the Court is not aware of any requirement of detailed notice to the would-be contractor of the reasons for a finding of nonresponsibility.
For the foregoing reasons, the Court finds no procedural irregularities in GSA's disqualification of plaintiff for non-responsibility which would warrant setting aside the agency's action pursuant to 5 U.S.C. § 706(2)(D).
Accordingly,
IT IS HEREBY ORDERED that plaintiff's "Motion in Limine to Exclude Improper, Irrelevant and Duplicative Evidence" is granted in part and denied in part, as indicated in the memorandum filed herewith.
IT IS FURTHER ORDERED that plaintiff's renewed motion for preliminary and permanent injunctive relief is denied.