995 F.2d 850
 37 ERC 1549, 23 Envtl. L. Rep. 21,288
 Richard WILKINS; Roland Smotherman, Appellees,
v.
SECRETARY OF the INTERIOR; Manuel Lujan, in his official
capacity; Superintendent of Ozark National Scenic
Riverways; Art Sullivan, in his official capacity as
National Park Superintendent; Appellants,
Randy Clark, an individual, Defendant.
 No. 92-2871.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 18, 1993.
Decided June 15, 1993.
Rehearing Denied July 28, 1993.
 
 Dirk D. Snel, Washington, DC, argued (Vicki A. O'Meara, Stephen B. Higgins and Joseph B. Moore of St. Louis, MO, and Brian L. Ferrell, M. Alice Thurston, and Dirk D. Snel, Washington, DC, of counsel), Marilyn Averill, Denver, CO, appear on the brief, for appellants.
 Douglas Kennedy, Poplar Bluff, MO, argued, for appellees.
 Before McMILLIAN, MAGILL and LOKEN, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 The Secretary of the Department of the Interior and the Superintendent of the Ozark National Scenic Riverways (collectively appellants) appeal from an order issued in the United States District Court for the Eastern District of Missouri permanently enjoining them from destroying, removing, moving, transporting, molesting or otherwise harming the feral or wild horses in the Ozark National Scenic Riverways Park. Wilkins v. Secretary of Dep't of the Interior, 798 F.Supp. 557 (E.D.Mo.1992) (Wilkins ). For reversal, appellants argue the district court erred in reviewing the action of the agency de novo and in substituting its own judgment for that of the agency. For the reasons discussed below, we reverse the order of the district court and vacate the permanent injunction.
 
 
 2
 The park, a 140-mile-long strip of land in Missouri along the banks of the Current River and the Jack's Fork River, was authorized by Congress in 1964. Approximately 20 free-roaming, unbranded, unclaimed, wild horses roam a 24-mile stretch of a total of 71,000 acres in the park. The origin of the wild horses is unknown. In 1985, 1989 and 1990, studies and aerial surveys were made to show the impact the wild horses had on the native fauna and plant communities in the park. In May 1990, the park superintendent issued a news release announcing the park would consider proposals to remove the wild horses from the park because they "are ill-equipped to contend with the harsh winters, disease, injury, food shortages and other environmental factors detrimental to their well-being" and because there "have been numerous reports of harassment and even shootings."[1] The National Park Service thereafter selected a plan, approved by the Secretary, for the removal of the wild horses and issued a special use permit to Randy Clark to trap the wild horses and remove them--either placing them for adoption or disposing of them. The government was to pay $1500 for the removal of the first five horses and $300 for each additional horse thereafter. Adverse public reaction included a petition signed by one thousand people and criticism from the Congressional representative for the district within which the park is located. In February 1991, the Secretary announced that the park would proceed with its plan to remove the wild horses from the park.
 
 
 3
 A group of local citizens (appellees) filed this action in federal district court against appellants, seeking an injunction to block the removal of the wild horses. Appellees claimed removal of the wild horses would deprive them of the opportunity to view the wild horses and would result in the disappearance of a part of the history, culture, and unique scenery of their community. The district court immediately granted a temporary restraining order.
 
 
 4
 After a trial on the merits, the district court issued a permanent injunction against the removal of the wild horses from the park, based on review under the arbitrary and capricious standard set forth in the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). Wilkins, at 561. The district court found the Secretary's decision to remove the wild horses was a clear error in judgment because the evidence at trial did not show the wild horses were detrimental to the use of the park. Id. at 563. The district court concluded the allegations of damage caused by the wild horses were exaggerated and found the wild horses did not pose any threat to visitors of the park or to park resources. Id. The district court further found that the Secretary failed to consider whether the wild horses were a cultural or historical resource. Id. at 563. This appeal followed.[2]
 
 
 5
 Appellants agree that the district court correctly declared that the "arbitrary and capricious" standard of review, 5 U.S.C. § 706(2)(A), governed this case. Appellants argue that, in applying this standard, a reviewing court's task is to determine whether the agency considered relevant factors and articulated a rational connection between the facts found and the choice made. They argue that, here, under the "rubric of clear error of judgment," the district court improperly reviewed the decision of the Secretary de novo and thus substituted its own judgment for that of the Secretary. Appellants argue the district court failed to defer to or fully analyze the administrative record and instead, by relying extensively on trial testimony, improperly developed its own record on which it based its decision.
 
 
 6
 Appellees argue the district court properly found the Secretary's decision violated the management policies of the National Park Service and was "arbitrary and capricious." Appellees argue the district court's decision should be upheld because the Secretary's action violated National Park Service policy which states "the management of exotic species already present will be undertaken wherever such species threaten park resources or public health." The wild horses are considered exotic species to the park; however, the district court found the evidence did not support the Secretary's findings that the wild horses threatened park resources and the public health. Id. at 563. We disagree.
 
 
 7
 Agencies typically perform three important functions: rulemaking, adjudication, and informal decision-making. Agency decisions should only be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Gettler v. Lyng, 857 F.2d 1195, 1198 (8th Cir.1988). The Secretary's decision was an informal agency decision for which the standard of review is to determine if the agency decision was arbitrary and capricious. 5 U.S.C. § 706(2)(A). Federal courts must defer to "any reasonable interpretation given to the statute by the agency charged with its administration," as well as to the agency's interpretations and application of its regulations and policies in carrying out its statutory duties, unless "plainly erroneous." Arkansas Poultry Federation v. United States Environmental Protection Agency, 852 F.2d 324, 325 (8th Cir.1988).
 
 
 8
 When reviewing agency decisions, both a district court and an appellate court must make an independent decision based on the identical record that was before the fact finder. Sierra Club v. Davies, 955 F.2d 1188, 1192 (8th Cir.1992). We hold that although the district court properly identified the standard of review to be for arbitrary and capricious action, it failed to apply it correctly. The district court concluded that the Secretary made an error in judgment and failed to consider relevant facts. Wilkins, at 564. The district court in the present case chose not to remand the matter to the Secretary, and instead developed independent findings of fact at trial. The proper standard of judicial review of agency decision-making does not permit the district court to make independent findings.
 
 
 9
 We have reviewed the administrative record and conclude there is sufficient evidence in the record to support the Secretary's decision and that the decision was not arbitrary and capricious. Studies have shown that the wild horses graze and trample 40-60 acres of planted crops on lands rented to permittee farmers. In addition to the planted crop damage, the wild horses pose a threat to native plants by nipping young trees and random trampling and grazing. The wild horses also compete directly with native wildlife for forage. The wild horses have made extensive trails along the 24-mile range which have begun to erode causing soil compaction and bank erosion. The wild horses are considered to be exotic species, and their continued presence in the park is in conflict with the purpose of the park which is to maintain, rehabilitate, and perpetuate the park's natural resources inherent integrity. We conclude these findings, set forth in the administrative record, are sufficient to support the Secretary's decision.
 
 
 10
 Our conclusion is supported by the 1916 Organic Act, 16 U.S.C. § 3, and the decision of the Tenth Circuit in New Mexico State Game Comm'n v. Udall, 410 F.2d 1197, 1199 (10th Cir.) (New Mexico ), cert. denied, 396 U.S. 961, 90 S.Ct. 429, 24 L.Ed.2d 445 (1969). The court in New Mexico construed the 1916 Organic Act in the following manner:
 
 
 11
 The obvious purpose of this language is to require the Secretary to determine when it is necessary to destroy animals which, for any reason, may be detrimental to the use of the [national] park. [the Secretary] need not wait until the damage through overbrowsing has taken its toll on the park plant life and deer herd before taking action no less than [the Secretary] would be required to delay the destruction of a vicious animal until after an attack on a person.
 
 
 12
 Id. Here, likewise, the Secretary need not wait for further damage to the park before taking action.
 
 
 13
 Accordingly, the order of the district court is reversed and the permanent injunction is vacated.
 
 
 14
 LOKEN, Circuit Judge, dissenting.
 
 
 15
 I respectfully dissent. In my view, the National Park Service prejudged the issue, coopered up a series of unsupported rationales in the hope of choking off public opposition, and then ignored well-founded objections from many Park constituents. To suit the Park managers' convenience and preconceived notions of culture and history, we will now incur significant expense and short-term environmental damage to remove a small band of wild horses from the 65,000-acre Ozark National Scenic Riverways. Most users of the Park believe (and the record establishes it is a reasonable belief) that these animals reflect the cultural heritage of the region and contribute toward what Congress intended to foster, with only negligible impact on the Park's other resources and attractions. I am hard-pressed to find a clearer example of arbitrary and capricious agency action.
 
 
 16
 1. We review informal agency actions to determine if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). If there is "a contemporaneous explanation of the agency decision," the decision must stand or fall on the propriety of that explanation. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1977). Absent a decision document, the question becomes whether "there was such failure to explain administrative action as to frustrate effective judicial review." Camp v. Pitts, 411 U.S. 138, 142-43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).
 
 
 17
 On appeal, the Secretary asserts that the decision document in this case is the Acting Assistant Secretary's February 1991 letter to Missouri Congressman Bill Emerson. But in the district court, Park Superintendent Arthur Sullivan, who was tendered by agency counsel as "the most important witness from a legal standpoint," testified on direct examination that a May 1990 press release was the decision document.[1]
 
 
 18
 Normally, the agency's identification of its decision document should be controlling. But the discrepancy here is troubling. We seek the contemporaneous agency explanation to review. If the Park Service's decision was in fact made in May 1990, then the agency's February 1991 Environmental Assessment, which contains the data summarized by the court to support its decision, is only "post-hoc rationalizations of the agency [that] cannot serve as a sufficient predicate for agency action." American Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 539, 101 S.Ct. 2478, 2505, 69 L.Ed.2d 185 (1981), citing Overton Park, 401 U.S. at 419, 91 S.Ct. at 825; Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 245-246, 9 L.Ed.2d 207 (1962); and SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).
 
 
 19
 Moreover, there is more than a nine-month discrepancy here; there is conclusive evidence that the Park managers actually made their decision long before it was announced in the May 1990 press release. This is suggested by the language of the press release itself--"Ozark Riverways is requesting proposals ... which will remove the horses from park lands and assure their continued well-being."[2] It is confirmed by the testimony of Superintendent Sullivan regarding a 1985 internal report entitled "Status and Proposed Management of Feral Horse Population":
 
 
 20
 Q Had there been a decision made prior to the [1985] study to remove the horses?
 
 
 21
 A ... I don't think there was ever any question about the decision being made, I think the decision was made for us under--under our rules and regulations and under the laws and policies. The management had no leeway.... I think the decision is built into the management policies of the National Park System and those in turn emanate from certain pieces of legislation.
 
 
 22
 Q So you're saying that ... it was inevitable [that] the rules, regulations, those things that you had cited ... would mandate you to remove the horses?
 
 
 23
 A That's correct.
 
 
 24
 Thus, the record establishes that the purported decision documents--either the May 1990 press release or the February 1991 letter--were generated long after the decision was effectively made. We know that those documents do not state Superintendent Sullivan's view that the decision was required by law. We do not know whether the Acting Assistant Secretary shared Superintendent Sullivan's view of his legal mandate, nor whether the Acting Assistant Secretary understood the real reason for Sullivan's decision. In these circumstances, I would set aside the agency action because there has been, to use the Supreme Court's phrase, "such failure to explain administrative action as to frustrate effective judicial review." If agency staff with primary responsibility make a decision they consider required by law, and the agency head approves that decision believing it was an exercise of discretion, the decision-making process has failed and the reviewing court must remand for further agency consideration. See General Elec. Co. v. Nuclear Regulatory Comm'n, 750 F.2d 1394, 1403-04 (7th Cir.1984) ("an agency cannot defend its actions on grounds different from those on which the actions were based").
 
 
 25
 2. I would also set aside this action because Superintendent Sullivan's conclusion that removal was mandated (not simply permitted) by governing statutes and regulations is not in accordance with law. Congress created the Ozark National Scenic Riverways "[f]or the purpose of conserving and interpreting unique scenic and other natural values and objects of historic interest ... management of wildlife, and provisions for use and enjoyment of the outdoor recreation resources thereof by the people of the United States." 16 U.S.C. § 460m. The Natural Park Service Organic Act authorizes the Secretary "to provide in his discretion for the destruction of such animals and of such plant life as may be detrimental to the use " of national parks. 16 U.S.C. § 3 (emphasis added).
 
 
 26
 In implementing these laws, the Park Service properly gives priority to native species of plants and animals over non-native or "exotic" species. Superintendent Sullivan opined that the Park Service's Natural Resource Management Policies require removal of the wild horses as an exotic species. Even accepting the agency's view that all horses must be considered non-native because they were brought to North America by Spanish explorers in the 1500s, the Management Policies merely provide:
 
 
 27
 Management of Exotic Species Already Present.
 
 
 28
 Management of populations of exotic plant and animal species, up to and including eradication, will be undertaken wherever such species threaten park resources or public health and when control is prudent and feasible.... High priority will be given to the management of exotic species that have a substantial impact on park resources.... The decision to initiate a management program will be based on existing, and where necessary newly acquired, scientific information that identifies the exotic status of the species, demonstrates its impact on park resources, and indicates alternative management methods and their probabilities of success.
 
 
 29
 Because wild horses were there before the Park was established, I think the above-quoted Management Policies required the agency to obtain "scientific information that ... demonstrates [their] impact on park resources" before taking action to remove them. At a minimum, it is clear that these laws and agency policies do not require removal of a non-detrimental exotic species. In other words, Superintendent Sullivan was wrong in believing he was required to remove the horses without any evidence of detrimental impact.
 
 
 30
 3. Finally, I agree with the district court that the agency's post-hoc rationalizations do not adequately support this action. There is no question that the Park managers labored long and hard to find a detrimental impact that would justify their removal decision, but in my view these efforts failed.
 
 
 31
 . Removal necessary to protect the horses. The May 1990 press release advanced the unsupported claim that the horses "are ill-equipped to contend with harsh winters, disease, injury, food shortages, and other environmental factors detrimental to their continued well-being." But the agency's own studies showed the horses to be in good health, except when harassed by Park users.[3]
 
 
 32
 . Damage to other Park resources. The 1985 study showed minimal damage to permittee crops, other plant life, or the river banks. Park management concluded in 1985 that "extensive investigation would take considerable time and money which may not be necessary," and the agency's February 1991 Environmental Assessment contained virtually no additional information.
 
 
 33
 . Risk of future detriment. The Acting Assistant Secretary's February 1991 letter warned ominously that "the feral horses are competing directly for forage with several species of wildlife." I agree with the court that the Secretary may base a decision upon perceived future harm and need not delay remedial action until great damage to the Park has been done. But the perception of future harm must be rational. Here, the agency's speculation about future harm was predicated upon significant increases in the horse population, whereas its studies show that the wild horses have kept to their relatively small fraction of the Park and have maintained their very small population over a long period of time. Thus, the agency's February 1991 Environmental Assessment could only lamely conclude that "[p]ermitting the horses to stay would require [the Park Service] to document and mitigate impact on listed species and habitats in the area."
 
 
 34
 . Subjective factors. Park management believes that it is "inappropriate" to allow wild horses to graze in a designated "natural zone" of the Park, even though most of the grazing they do is on natural zone land leased to agricultural permittees for modern mechanized farming. That subjective judgment of the responsible agency is clearly entitled to significant weight. But the Park Service Management Policies also require park managers to "locate, identify, evaluate, preserve, manage, and interpret qualified cultural resources." In this case, the Park managers flatly refused to consider whether wild horses are a significant part of the cultural heritage of this region. In the Wild Free-Roaming Horses and Burros Act of 1971, 16 U.S.C. §§ 1331 et seq., Congress declared:
 
 
 35
 It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture [and] are to be considered ... as an integral part of the natural system of public lands.
 
 
 36
 The Park Service correctly notes that this act applies only to the Bureau of Land Management and the National Forest Service. However, the statute is relevant in determining whether wild horses are cultural resources worthy of protection if they are not otherwise detrimental to a national park. Superintendent Sullivan and the Park Service simply ignored this highly relevant factor.
 
 
 37
 In these circumstances, I believe that the district court correctly set aside the agency action at issue. The agency decision neither flowed from the reasons offered in its decisional documents nor reflected consideration of all relevant factors. The Park Service has translated statutes and policies that grant discretion to control exotic species into an absolute mandate for removal, thereby ignoring important statutory directives, such as the need to conserve the Park's "natural values and objects of historic interest" and provide "for use and enjoyment of the outdoor recreation resources thereof by the people." 16 U.S.C. § 460m. Without otherwise restricting the agency in its future management of the Park,[4] I would enjoin implementation of this arbitrary and legally unsound decision.
 
 
 
 [1]
 Reports include the shooting of a mare for her colt, the death of a stallion resisting capture, and the shooting of a horse purportedly to attract coyotes
 
 
 [2]
 Clark also filed an appeal (No. 92-3239) and the two appeals were consolidated for purposes of appeal. However, Clark's appeal was later dismissed for failure to prosecute. Wilkins v. Clark, No. 92-3239 (8th Cir. Nov. 23, 1991) (order)
 
 
 [1]
 The district court's evidentiary hearing did not exceed the proper scope of judicial review. The Supreme Court has advised that, absent formal agency findings, "it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). See also Arkla Exploration Co. v. Texas Oil & Gas Corp., 734 F.2d 347, 357 (8th Cir.1984), cert. denied, 469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985)
 
 
 [2]
 Thus, the agency did not seek public input on whether to remove the horses, only on how to remove them
 
 
 [3]
 I reject the agency's suggestion that the horses must be removed to protect them from human harassment. If poachers kill moose or grizzly bears or bison in Yellowstone National Park, would the Park Service seriously suggest that the wildlife be removed?
 
 
 [4]
 I agree with the Secretary that the district court's permanent injunction should be vacated because it improperly precludes the agency from revisiting this issue in the future. That is an overbroad remedy for informal agency action that is found to be arbitrary, capricious, or not in accordance with law