BIOSPHERICS, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Aspen Systems Corp., Intervenor.

No. 00–429C.

United States Court of Federal Claims.

Filed: Oct. 17, 2000.

Original Opinion Filed Under
Seal Sept. 28, 2000 [a].

a. This opinion was originally filed under seal. Redaction of protected/privileged material is in-dicated by " * * * ".

2

Eric Marcotte, Washington, DC, for plaintiff. Paul Ebert, Washington, DC, of counsel.

Erin E. Powell, U.S. Department of Justice, Washington, DC, with whom were David W. Ogden, Assistant Attorney General, Director David M. Cohen, and Assistant Director Todd M. Hughes. Assistant General Counsel, Charles H. Sides, Jr., U.S. General Services Administration, of counsel.

Gilbert J. Ginsburg, Washington, DC, for intervenor. Daniel B. Abrahams, of counsel.

**OPINION**

FIRESTONE, Judge.

This post-award bid protest action comes before the court on the parties' cross motions for judgment on the administrative record. Plaintiff, Biospherics, Inc. ("Biospherics"), the incumbent contractor, challenges an award by the General Services Administration ("GSA") of a contract to provide information and referral services to operate GSA's nationwide Federal Information Center to Aspen Systems Corporation ("Aspen"). Biospherics seeks to enjoin GSA from proceeding with the contract award and to have GSA reopen the competitive bid process on the grounds that GSA conducted the procurement in an arbitrary manner.

On July 21, 2000, Biospherics filed its complaint in this court. The court held a telephonic status conference with the parties on July 25, 2000, wherein the parties agreed that plaintiff's motion for a preliminary injunction would be consolidated with resolution of the case on the merits. By order dated July 25, 2000, the court set a briefing schedule for the parties' cross motions for judgment on the administrative record and granted Aspen's motion to intervene. The parties and Aspen completed briefing on September 15, 2000, and the court heard oral argument on September 25, 2000.

## I. Facts

### A. *The Solicitation*

On November 16, 1998, GSA electronically posted Request For Proposal TQD–RC–98–0002 ("solicitation") that sought information and referral services to operate the Federal Information Center ("FIC"). The FIC provides the general public with information about federal agencies, programs, and services, and provides responses to inquiries regarding subjects that cover the entire range of federal activities.

The solicitation contemplated the award of a single, indefinite-delivery, indefinite-quantity type contract, with an initial period of

performance through September 30, 2000, and four one-year options to extend.[1] The contractor's responsibilities under the contract were described in the solicitation as follows:

[t]he Contractor's primary responsibility is to answer inquiries (usually by telephone and TTY, but also via other media) about Federal Government agencies, programs, services, and related issues.

Other, key responsibilities include the *maintenance of supporting database(s) and web site(s)*; the conducting of an agency liaison program and certain publicity efforts; the creation of and delivery of activity and progress reports; and the responsibility for all support activities related to the operation of the FIC and related programs.

Section B of the solicitation broke out for payment purposes the major activities required under the contemplated contract and assigned each of these activities a Contract Line Item Number ("CLIN"). The present controversy centers on the parties' proposals for the CLIN associated with maintenance of the internal database. The internal database serves as the primary resource employed by FIC employees in responding to public inquiries. Section C.5.2.1.1 of the solicitation set forth the specific requirements relating to internal database maintenance:

[t]he Contractor shall update, revise, and otherwise maintain currency and accuracy of database entries as new resource information becomes available, currently-included information becomes outdated, or changes of any type are needed in database content or entry....

The Contractor shall systematically and regularly acquire new information by reviewing newspapers, reviewing publication availability, and by acquiring such information resources as may support performance in accordance with the requirements of this contract.

---

1. The solicitation initially called for a period of performance from the Date of Award through September 30, 1999. Solicitation Amendment 0007, issued on October 1, 1999, changed the period of performance to include a period from the date of Notice to Proceed through September 30, 2000 with four one-year options.

The solicitation further described the detail required in each offeror's proposal with respect to database maintenance at Section L.7.2.5.3:

> b.... (1) The ADP operations strategy shall, at a minimum, explain the following general issues ...
>
> (f) How database maintenance (data integrity and update) shall be handled.

In addition, Section M.1.2.5 provided that, with respect to internal database maintenance, the offerors' proposals should, "[a]t a minimum, ... consist of the offeror's approach to equipment/software configuration and operations strategy."

Pursuant to the solicitation, the contract was to be awarded to the offeror who submitted the lowest-priced, technically acceptable offer. Section M.1.1 of the solicitation summarized the general bid evaluation procedure:

> [t]he Government will first review unpriced technical proposals to determine which are technically acceptable to the Government, or could, after discussions, be made acceptable to the Government. Only those offerors that have submitted technically acceptable proposals will go through price evaluations.

### B. *The Parties' Proposals*

Internal database maintenance is at the heart of the FIC program. A review of the initial proposals from each of the parties with respect to this CLIN shows that from the outset Aspen and Biospherics each had a very different approach to the task.

Aspen's initial and subsequent proposals consolidate the tasks of research and database maintenance in one staff. * * *

In its final revised proposal, Aspen altered its staffing plan by adding * * * more employees, including * * * Research Specialists and * * * data entry clerks to assist the Research Specialists with updating database entries. Aspen explained that these additional staff were included to meet GSA's concerns regarding database maintenance. However, Aspen's approach to the work remained the same, even with these additional staff.

In contrast to Aspen's approach, Biospherics' initial proposal, which remained unchanged throughout the procurement process, called for separate staffs to independently generate information and perform database maintenance tasks. Under Biospherics' approach, information is generated for inclusion in the database by a variety of sources, including: Information Specialists and their research support staff, surveillance of news media, caller-provided information, input resulting from topic and contact analysis, updates on telephone area codes and exchanges, and information from other government agencies and other sources. Once generated, the information is turned over to the database maintenance staff, who is responsible for updating and maintaining the database. * * *

### C. *The Competitive Range Determination*

On April 28, 1999, GSA's Technical Evaluation Panel ("TEP") convened to review the proposals submitted in response to the solicitation. The August 11, 1999 evaluation report found that none of the five proposals received by GSA was technically acceptable. However, the TEP classified Biospherics' and Aspen's proposals as "[u]nacceptable, but capable of being made acceptable without a major rewrite." In accordance with FAR § 15.306(c), GSA established a competitive range consisting of Biospherics and Aspen on August 17, 1999.

### D. *Technical Discussions*

Pursuant to the terms of the solicitation, the TEP evaluated Aspen's and Biospherics' proposals based on seven technical factors of equal importance: experience, past performance, management plan, staffing plan, technical approach to accomplishing the work, approach to quality, and model workload. The solicitation further provided that each factor was to be graded on a pass/fail basis, and that "a proposal must have a passing grade in all evaluation factors," to be found technically acceptable.

GSA conducted two rounds of technical discussions with both offerors. After each round, on October 26, 1999, and again on

November 30, 1999, Aspen and Biospherics submitted revised technical proposals. In addition, the offerors submitted revised price proposals along with the October 26, 1999 technical revisions, in response to an amendment to the solicitation. The TEP issued its final evaluation report on December 6, 1999, concluding that the November 30, 1999 revised technical proposals submitted by Biospherics and Aspen were technically acceptable.

### E. *Price Evaluation and Discussions*

In accordance with the solicitation, GSA next submitted the price proposals to the Price Evaluation Panel ("PEP") for review. Section M.1.3 provided that the "total evaluated price of each offeror's proposal will be the sum total of ... [a]ll categories of service, for all contract periods provided for in Section B...." The PEP based its initial price analysis upon the revised price proposals submitted by each offeror on October 26, 1999. Biospherics proposed a total contract price of * * *. Aspen's proposal offered a total contract price of * * *. The Independent Government Cost Estimate ("IGCE") was derived from the prices currently paid under the existing contract.

The PEP conducted a price evaluation for the purpose of generating discussions with each offeror using the criteria set forth in the Pre–Negotiation Memorandum. The PEP used a two-step analysis to evaluate prices, which was described as follows:

[m]y initial price analysis consisted of comparing each Base Period unit price to the same information in the Program Office's revised IGCE. The results of the price comparison reflect the need for discussions with each offeror.... The criterion used to identify significantly low prices was a[50] [2] percent variance from the IGCE. Government's objective for prices identified as significantly high is 200 percent over the IGCE. [hereinafter "50% under/200% over"]

Proposed prices were also evaluated on a year-by-year basis to ensure balance throughout each proposal. The criterion used to determine if discussions were required on Option Period prices was a 10 percent variance from the previous year's price. [hereinafter "price indexing"]

### 1. *First Round of Price Discussions*

On January 7, 2000, the contracting officer held discussions with each offeror regarding its price proposal. Using the "50% under/200% over" and "price indexing" criteria, GSA had identified several pricing issues in both Aspen's and Biospherics' proposals that required discussion.

With regard to Aspen's base period proposed prices, GSA identified five CLIN's that were assessed as high and two CLIN's that were assessed as low in comparison to the IGCE.[3] Of particular relevance to Biospherics' challenge here, GSA indicated that Aspen's price for internal database maintenance was "significantly low" when evaluated against the IGCE. * * * In addition, because GSA observed a * * * increase in Option Year 1, GSA indicated that Aspen's price indexing for internal database maintenance for this year was "significantly high." GSA also advised Aspen that its price indexing was "significantly high" for two additional CLIN's in two option years and identified "significant price reductions" in seven CLIN's for various option years.[4]

---

**2.** The Pre–Negotiation Memorandum of the Contracting Officer misstates the "50% or more below the IGCE" standard as "100% below." The actual price variance used was a variance of greater than or equal to 50% below the IGCE. The worksheets included in the Pre–Negotiation Memorandum corroborate the use of the correct price variance.

**3.** GSA identified the base period unit price for the following CLIN's in Aspen's proposal as high: maintenance of other web-based databases; maintenance of specialized databases; creation of other web-based databases; creation of specialized databases; and reports. In addition, GSA identified the base period unit price for the following CLIN's in Aspen's proposal as low: maintenance of internal database; and public awareness.

**4.** In addition to its price proposal for internal database maintenance for Option Year 1, GSA advised Aspen that its price indexing was "significantly high" with respect to the CLIN's for creation of other web-based databases and creation of specialized databases for Option Years 1 and 2. GSA also informed Aspen that it observed that Aspen's price indexing with respect to Op-

With regard to Biospherics' base period prices, GSA identified four CLIN's that were assessed as high and two CLIN's that were assessed as low in comparison to the IGCE.[5] GSA did not discuss Biospherics' base period unit price of * * * for internal database maintenance because it was not more than 50% under or 200% over the IGCE. Biospherics was also informed that its price indexing for two CLIN's was "significantly high" in three option years.[6] None of the CLIN's in Biospherics' proposal for option years was identified as having price indexing that reflected "significant price reductions."

Following discussions, on January 14, 2000, GSA sent requests for final revised proposals to Biospherics and Aspen and informed the offerors that discussions were closed. Biospherics and Aspen submitted final revised price proposals on January 21, 2000. The final revised price proposals revealed that Aspen's base period unit price proposal * * * for internal database maintenance was still significantly lower than the IGCE, although it reflected an increase from the unit price proposed in the October 26, 1999 proposal.

### 2. Reopening of Discussions

As a result of Aspen's low price for internal database maintenance, the contracting

tion Year 1 CLIN's for public inquiries (base period), CIC order processing, other agencies telephone time, maintenance of web-searchable databases, maintenance of specialized databases, and reports, reflected "significant price reductions." With respect to Option Years 2 and 3. GSA's analysis revealed that CLIN's for maintenance of specialized databases indicated "significant price reductions."

5. GSA identified the following CLIN's in Biospherics' proposal as high: maintenance of other web-based databases; maintenance of specialized databases; creation of other web-based databases; and creation of specialized databases. In addition, GSA identified the following CLIN's in Biospherics' proposal as low: workload options 1—8; and maintenance of web-searchable database.

6. GSA informed Biospherics that its price indexing was "significantly high" with respect to the CLIN's for maintenance of other web-based databases and maintenance of specialized databases for Option Years 1, 2, and 3.

officer sent letters to Biospherics and Aspen on March 2, 2000, stating that he would reopen discussions. GSA advised Biospherics that its proposal was considered "technically acceptable" and that "[a]t this time, there are no pricing issues to discuss with your firm." GSA told Aspen that its proposal was "technically acceptable," but that its pricing for internal database maintenance was still considered low. GSA attached a list of five technical questions to Aspen's letter involving maintenance of the internal database.[7]

* * *

On that same day, the contracting officer and TEP met with Aspen to discuss its price proposal for maintenance of the internal database. The contracting officer recorded his notes from the discussions in a memorandum to the file, which reveals that Aspen explained the price disparity between Aspen and the IGCE pertaining to internal database. * * *

The next day, on March 3, 2000, Aspen provided a written response further elaborating upon its technical approach to maintenance of the internal database. * * *

Aspen further explained that its pricing proposal for this particular CLIN was low for two primary reasons. * * *

7. Evidently, GSA misspoke in the attachment to its March 2, 2000 letter. GSA states that Aspen's price proposal of "March 23, 1999 was significantly lower than the [IGCE]" and that Aspen's "Final Revised Proposal further reduced the price for this item by a significant amount." Biospherics objects to GSA's specific reference to Aspen's original March 1999 proposal, which was actually higher than the October 1999 proposal used in GSA's price evaluation, suggesting that this information clued Aspen in to the portions of its proposal that needed adjustment. The GAO considered this particular allegation and based on the record, found that GSA's reference to Aspen's March 1999 proposal was simply a mistake on the part of GSA. This court's review of the record also reveals that GSA was mistaken. The offerors' March 1999 proposals were superseded by revised proposals submitted by both Aspen and Biospherics on October 26, 1999, in response to an amendment to the solicitation. See supra, at 4–5. The court also finds that Aspen's Final Revised Proposal of January 21, 2000 in fact increased its October 26, 1999 price * * *, although this amount was still significantly lower than the IGCE.

Finally, Aspen advised GSA that it planned to add * * * full-time research specialists and * * * full-time data entry operators to perform database maintenance tasks.

On March 4, 2000, the TEP chairman, * * * issued a memorandum stating that the "difference between [Aspen's] proposal and the Government's price model is based on a different approach to the work [to] be performed." The TEP chairman found that Aspen's proposal was in compliance with the terms of the solicitation, was a reasonable proposal, and, with the additional persons that Aspen had added, provided even more value to the Government. As the TEP chairman explained in his memorandum:

> [Aspen's] oral response explained that slightly over * * * of the specialists' time was to be dedicated to the maintenance of the internal-use database * * *. *This was reasonable and in compliance with the technical proposal.* The written response states that they intend to hire additional employees in this area, and to dedicate nearly * * * to the database task. *This is also a reasonable solution, with more value to the Government, and is in conformance to their technical proposal.*

(emphasis added).

Thereafter, on March 9, 2000, GSA conducted telephone conferences with each offeror to discuss items in the proposals that were still significantly above or below the IGCE. The contracting officer followed up discussions with both offerors in its March 9, 2000 letter requesting final revised proposals from Biospherics and Aspen. In their respective letters, GSA provided Aspen and Biospherics each with a list of CLIN's that were still significantly above and below the IGCE that were discussed in the telephone conferences that day.[8] GSA also cautioned both offerors that "any changes to your technical proposal may render it unacceptable." In addition, GSA advised Aspen to provide re-

placement pages for its technical proposal if the information provided during discussions made technical changes.

Thereafter, on March 14, 2000, GSA received a final revised price proposal from Biospherics, and final revised price and technical proposals from Aspen.

### F. *Award to Aspen*

On March 21, 2000, GSA awarded the contract to Aspen. In its March 20, 2000 Post–Negotiation Memorandum, GSA explained the basis of its decision. The memorandum summarized GSA's reevaluation of Aspen's revised technical and price proposals as follows:

> The [TEP] was reassembled on March 16, 2000 to evaluate Aspen's revised technical proposal. Later that same day the [TEP] completed its report documenting the consensus that Aspen's revised proposal is technically acceptable....
>
> All prices in Aspen's Final Price Proposal, dated March 14, 2000, are considered fair and reasonable based on adequate price competition and in comparison to the Government's Independent Cost Estimate.

In addition, the Post–Negotiation Memorandum reflected that the final total evaluated prices were * * * for Biospherics and * * * for Aspen. With respect to the CLIN for internal database maintenance, Biospherics proposal was over * * * more than Aspen's price, or * * * versus Aspen's price of * * *. Because the solicitation stated that the award was to be made to the offeror who submitted the lowest-priced, technically acceptable proposal, GSA awarded the contract to Aspen.

### G. *Biospherics Protest before the GAO*

Biospherics requested and received a formal debriefing on March 30, 2000. Then, on April 4, 2000, Biospherics filed a protest with the General Accounting Office ("GAO"), chal-

---

**8.** In its letter to Biospherics, GSA identified the following as significantly high priced categories: maintenance of specialized databases; creation of web-based databases; and creation of specialized databases. GSA further advised Biospherics the following were in the significantly low priced category: workload options 3 through 8; and maintenance of web searchable databases. With respect to Aspen, GSA stated that the following were significantly high priced categories: maintenance of specialized databases; creation of web-based databases; creation of specialized databases; and reports. GSA advised Aspen that the following were significantly low priced categories: maintenance of internal use database; and public awareness.

lenging the award on grounds similar to those argued before this court.

On July 14, 2000, the GAO denied Biospherics' protest in its entirety. The following conclusions by the GAO are relevant to this proceeding:

Since GSA did not consider Biospherics' price for [internal database maintenance] to be excessive or unreasonable, it was not required to raise the issue during discussions.... In contrast, since GSA did consider Aspen's price for this service to be excessive, it was appropriate for the agency to raise this issue with Aspen during discussions....

GSA believed it was reasonable for the range to extend less on the downside and more on the upside. According to GSA, proposed prices below the IGCE would raise concerns about the lack of a clear understanding of the requirements, but the dynamics of competition would drive prices down to their lowest possible point, which meant that proposed prices above the IGCE were of less concern. In the context of a price analysis, we cannot conclude that GSA's use of a percentage range to conduct its price analysis and determine items for discussions was improper....

Our review of the record leads us to conclude that GSA did not improperly favor Aspen over Biospherics in this procurement....

We find the [issue of Aspen's technical acceptability] to be untimely raised.

On July 21, 2000, Biospherics filed its complaint with this court, seeking a permanent injunction of the contract award and reopening of the competitive bid process.

## II. The Scope and Standard of Review

Pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (1994 & Supp. IV 1998), review of a post-award bid protest action is based on the administrative record developed before the relevant contracting agency. *See Cubic Applications, Inc. v. United States,* 37 Fed. Cl. 339, 341 (1997). Under its jurisdictional statute, this court is required to apply the standard of review prescribed in the Administrative Procedure Act, which authorizes a court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A) (1994); *see also Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132 (Fed.Cir.1998); *Dubinsky v. United States,* 43 Fed.Cl. 243, 253 (1999); *Miller–Holzwarth, Inc. v. United States,* 42 Fed.Cl. 643, 649 (1999).

■ While the court is not bound by the GAO's decision, it becomes part of the administrative record under 31 U.S.C. § 3556 (1994 & Supp. IV 1998). *See Cubic Applications,* 37 Fed.Cl. at 341–42. Because the GAO has substantial expertise in procurement matters, the court may be guided by the GAO's decision in its own evaluation of the procurement process. *See id.* at 342.

■ Under the standard set forth above, the aggrieved bidder has the burden to demonstrate that there is no rational basis for the agency's decision. *See Delbert Wheeler Constr., Inc. v. United States,* 39 Fed.Cl. 239, 247 (1997), *aff'd,* 155 F.3d 566, 1998 WL 244202 (Fed.Cir.1998). In addition, to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it. *See Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057 (Fed.Cir.2000); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996).

Ordinarily, a bid protest action is considered on cross motions for judgment on the administrative record. A motion for judgment on the record is treated as a motion for summary judgment under Federal Rule of Civil Procedure 56(a). *See* Rules of the Court of Federal Claims ("RCFC") 56.1(a); *Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255, 1997 WL 177509 (Fed.Cir.1997). Summary judgment or judgment on the administrative record is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In assessing the record, the court is required to resolve all ambigui-

ties and to draw all factual inferences in favor of the nonmoving party. *See Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505. When the parties have filed cross motions for summary judgment, the Court must evaluate each on its own merits. *See Thermocor, Inc. v. United States,* 35 Fed.Cl. 480, 485 (1996) (citing *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988)).

It is against this backdrop that the court will review the parties' cross motions for judgment on the administrative record.

### III. GSA's decision to award Aspen the contract was proper and in accordance with the law

#### A. *GSA conducted meaningful discussions with both offerors*

The FAR 15.306(d) sets forth the requirements for "meaningful discussions:"

> (2) The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation.
>
> (3) The contracting officer shall ... indicate to, or discuss with, each offeror still being considered for award, significant weaknesses, deficiencies, and other aspects of its proposal (such as cost, price, technical approach, past performance, and terms and conditions) that could in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. The scope and extent of discussions are a matter of contracting officer judgment.

48 C.F.R. § 15.306(d)(2), (3) (2000).

▉▉▉ "Case law provides that discussions are meaningful if they generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit." *Advanced Data Concepts, Inc. v. United States,* 43 Fed.Cl. 410, 422 (1999), *aff'd* 216 F.3d 1054 (Fed.Cir. 2000) (internal quotations and citations omitted). In accordance with the discretion provided under the FAR, however, "[a]gencies need not discuss every aspect of the proposal that receives less than the maximum score or

identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others." *Development Alternatives, Inc.,* Comp. Gen. B–279920, Aug. 6, 1998, 98–2 CPD ¶ 54, at 7; *SeaSpace Corp.,* Comp. Gen. B–252476.2, June 14, 1993, 93–1 CPD ¶ 462, at 15, *recon. denied,* Comp. Gen. B–252476.3, Oct. 27, 1993, 93–2 CPD ¶ 251; *see also CHP Int'l, Inc.,* Comp. Gen. B–266053.2, Apr. 29, 1996, 96–2 CPD ¶ 142, at 7. Rather, the agency should tailor its discussions to each offer, since the need for clarifications or revisions will vary with the proposals. *See CHP Int'l,* 96–2 CPD ¶ 142, at 7 (citing *Pragma Corp.,* Comp. Gen. B–255236, et. al., Feb. 18, 1994, 94–1 CPD ¶ 124); 48 C.F.R. § 15.306(d)(1) (2000). Ultimately, both the decision to conduct discussions and the scope of any discussions are left to the judgment of the contracting officer. *See Labat–Anderson v. United States,* 42 Fed.Cl. 806, 834 (1999) (citations omitted); *Cubic Def. Sys., Inc. v. United States,* 45 Fed.Cl. 450, 471 (1999).

Here, Biospherics contends that GSA violated the FAR in failing to conduct meaningful discussions with Biospherics. In particular, Biospherics charges that the 50% under/200% over price analysis methodology, used by GSA to identify areas for discussion, was (1) contrary to the requirements of the solicitation, (2) arbitrary, and (3) prejudicial to Biospherics. The court will examine each of these contentions in turn.

#### 1. *GSA's 50% under/200% over criteria was not contrary to the solicitation*

Biospherics contends that under the terms of the solicitation, GSA was required to evaluate each proposal "on the total prices of the offeror's proposal," and that GSA ignored the solicitation by focusing its price evaluation on the base period alone, only looking at option years if there was a price variance beyond 10% between years. Section M.1.3 of the solicitation, entitled Price Evaluation, provides that price proposals will be "evaluated based on the total prices of the offeror's proposal." Section M.1.3 further provides that the "total evaluated price of each offeror's proposal will be the sum total of ... [a]ll

categories of service, for all contract periods provided for in Section B . . . ."

 By its terms, Section M.1.3 does not identify any particular method by which to evaluate the total prices, leaving to agency discretion how this is to be done. "The depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion and we will not disturb such an analysis unless it lacks a reasonable basis." *Amerikov–OMSERV*, Comp. Gen. B–252879, 252879.5, Dec. 5, 1994, 94–2 CPD ¶ 219, at 4 (citing *Management Tech. Servs.*, Comp. Gen. B–251612.3, June 4, 1993, 93–1 CPD ¶ 432). Absent clear evidence in the solicitation itself, directing GSA to employ a specific price criteria or methodology to evaluate price, the court will not read into the solicitation a limitation on agency discretion.

 The record demonstrates that GSA's price evaluation consisted of the following two steps. GSA first determined if a price was reasonable and realistic by examining whether it was more than 50% under or 200% over the IGCE. Next, GSA conducted a year-by-year comparison of the "price indexing" for each CLIN in each option year to ensure consistency or balance in price throughout the entire contract period. GSA applied a 10% variance criterion to identify significant increases or reductions in the offerors' price indexing between the base year and each successive option year.[9] Finally, at the conclusion of all discussions, GSA analyzed the offerors' final proposals by comparing the total prices of each offeror's proposal to the other.

The record reflects that GSA applied this approach equally and fairly to both offerors' price proposals. Moreover, the record dem-onstrates that for the purpose of award, GSA based its evaluation on the total price of each offeror's proposal. Tables 6 and 6a in GSA's Post–Negotiation Memorandum reflect GSA's comparison of the offerors' total prices. The memorandum concludes that Aspen's proposal "provides the lowest total evaluated price," and therefore, the contract was awarded to Aspen. In such circumstances, the court finds that GSA's price evaluation approach did not violate the solicitation requirements.

### 2. *GSA's 50% under/200% over criteria is not irrational*

Next, Biospherics argues that GSA had no rational basis for its 50% under/200% over price evaluation approach. Biospherics argues that the approach is arbitrary and unsupported by the record. For the reasons that follow, the court disagrees.

In its Pre–Negotiation Memorandum, GSA expressly set forth the criteria it established to evaluate the offerors' base period prices:

> [m]y initial price analysis consisted of comparing each Base Period unit price to the same information in the Program Office's revised IGCE. The results of the price comparison reflect the need for discussions with each offeror. . . . The criterion used to identify significantly low prices was a 50 percent variance from the revised IGCE. Government's objective for prices identified as significantly high is 200 percent over the revised IGCE.

GSA explained its rationale for using this criteria in response to questions posed by the GAO during Biospherics' protest before that tribunal.[10] GSA stated that:

9. Biospherics argues that the price evaluation methodology established by GSA leads to absurd results. For example, Biospherics explains, GSA's analysis concluded that Aspen's price indexing with respect to internal database maintenance for Option Year 1 was considered "significantly high," even though its base period unit price for the same CLIN was rated as "significantly low." Contrary to Biospherics' suggestion, the methodology GSA selected does not lead to absurd results. The determination that a particular CLIN is priced too low in comparison to the IGCE is a different issue than the determination that there is too much variability in an option year. The fact that an option year in-crease needs to be explained does not alter the fact that the relevant base period price is high or low. GSA was simply looking at two different factors of the offerors' price proposals in evaluating both price and price indexing.

10. In its reply brief, Biospherics calls into question the weight of GSA's explanation of the 50% under/200% over criteria, characterizing it as argument by counsel. The court recognizes that review of agency action is limited to the administrative record. *See Cubic Applications*, 37 Fed. Cl. at 342. However, the Court of Federal Claims has also recognized certain limited excep-

[p]roposed prices that are below the IGCE raise concerns over cost realism such as a lack of a clear understanding of the requirements. Obviously such a concern, which would jeopardize contract performance, does not apply to the incumbent provider. As for proposed prices that are above the IGCE, the dynamics of competition will drive prices down to their lowest possible point, while prices that are below the IGCE will begin to run the risk of insufficient cost realism. Without the same type of dynamic that competition provides, the variance from the IGCE for low pricing areas must be considerably less to protect the Government's best interests.

■ Agencies are given broad latitude in establishing methods to evaluate price proposals. *See Enmax Corp.*, Comp. Gen. B–281965, May 12, 1999, 99–1 CPD ¶ 102, at 9; *Amerikov–OMSERV*, 94–2 CPD ¶ 219, at 4. In the context of a fixed-price contract, this latitude is very broad. *See Cube Corp.*, Comp. Gen. B–277353, Oct. 2, 1997, 97–2 CPD ¶ 92, at 5.

■ In the circumstances of this case, the court cannot say that GSA's approach is irrational. In particular, the court finds that GSA was not unreasonable in concluding that a proposed price that is 50% or more below the IGCE raises concerns about the offeror's contract performance, which are not present when the proposed price is above the IGCE. *See id.* at 6 ("[T]he issue such evidence raises is whether [the offeror] will be able to perform the contract requirements at the price proposed, not whether the offeror has taken exception to the contract requirements."). In contrast, discussions regarding a price above the IGCE are aimed at putting the

offeror on notice that its price is not competitive. Thus, rationality does not require that the trigger for price discussions be identical for high and low proposals. Numerous cases hold that the government has no responsibility to inform an offeror that its price is high, unless the offeror's price is considered to be excessive or unreasonable. *See Miller–Holzwarth*, 42 Fed.Cl. at 654 (citing *Telos Corp.*, Comp. Gen. B–279493, July 27, 1998, 98–2 CPD ¶ 30, at 11; *Applied Remote Tech., Inc.*, Comp. Gen. B–250475, Jan. 22, 1993, 93–1 CPD ¶ 58, at 2); *ATJ & Assocs., Inc.*, Comp. Gen. B–284305, B–284305.2, Mar. 27, 2000, 2000 CPD ¶ 60, at 8–9. The court cannot conclude that GSA was unreasonable in employing a 200% over criterion for determining that a price is excessive. Accordingly, the court will not set aside the award on the grounds that the price methodology employed by the agency was irrational.

3. *Biospherics was not prejudiced by the discussions*

■ In view of the court's finding regarding GSA's price methodology, the court also finds no merit to Biospherics' additional contention, that it was prejudiced by GSA's discussions with Aspen. Biospherics argues that GSA's 50% under/200% over price evaluation methodology resulted in unequal discussions because under that approach, Aspen was informed that its proposal for maintenance of the database was low, but that Biospherics was never informed that its proposal for the same CLIN was high, even though it was over 50% higher than the IGCE over the life of the contract.[11] Based on its review of the record, the court concludes that GSA's discussions were not prejudicial.

tions to this rule, including "when agency action is not adequately explained in the record before the court." *Pikes Peak Family Hous., LLC v. United States*, 40 Fed.Cl. 673, 677 (1998) (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir. 1989)). Here, GAO asked GSA to explain the basis for its price evaluation criterion. It did so by providing an answer through Charles Sides, Assistant General Counsel for GSA. The fact that this explanation was provided during proceedings before the GAO, rather than during proceedings before this court, is of no moment.

11. Biospherics makes much of the fact that GSA, by focusing on the base period (in which it was below the IGCE), never told Biospherics that its price for the overall contract period was higher than the IGCE. The court does not find GSA's focus on the base period to be irrational because GSA also evaluated increases between option years and informed offerors if their option year prices deviated too much form an otherwise acceptable base period price. GSA's conclusion that Biospherics' price for database maintenance was reasonable, vis-á-vis the IGCE, and thus, did not warrant discussion, is supported by the record.

GSA evaluated both offerors' proposals by applying the *same* 50% under/ 200% over methodology to both proposals. As noted above, this evaluation triggered discussions with *both* offerors regarding various CLIN's that were above and below the IGCE. *See supra* at 5 n. 3; at 6 n. 5. During discussions, GSA gave each offeror information regarding price proposals that were deemed significantly high or low under the criteria established by GSA. Thus, the record reflects that both parties were treated *equally* under the established criteria. In such circumstances, where the methodology established by the agency is fair and fairly applied, Biospherics cannot show that it was prejudiced on the grounds that GSA discussed price for internal database maintenance with only Aspen.

In this connection, Biospherics' reliance on *Dubinsky,* 43 Fed.Cl. at 261 and similar GAO decisions is misplaced. In *Dubinsky,* the agency had engaged in communications with one technically unacceptable offeror aimed at enabling that offeror to correct deficiencies in its proposal, after discussions were closed and without allowing the other offerors to submit revised proposals. *See id.* at 261–62. The present case is clearly distinguishable. As an initial matter, GSA had found Aspen's proposal technically acceptable back in December of 1999. *See supra* at 6. Second, as discussed above, the record demonstrates that GSA properly reopened discussions and invited both Aspen and Biospherics to revise their price proposals with regard to certain aspects of their proposals that remained significantly high and low.

Likewise, Biospherics' reliance on *Price Waterhouse,* 65 Comp. Gen. 205, 210 (1986), is misplaced. In *Price Waterhouse,* the GAO's conclusion that the agency conducted unequal discussions was based on the fact that both offerors' initial proposals were "unreasonably high," yet in discussions, the agency brought it to the attention of only one offeror. *See id.; see also CitiWest Props., Inc.,* Comp. Gen. B–274689, B–274689.4, Nov. 26, 1997, 98–1 CPD ¶ 3, at 5–6 (holding discussions improper where agency did not allow one offeror to improve its proposal, while allowing other offerors to submit revised pro-

posals). As explained above, the present case is distinguishable in that GSA determined that Biospherics' price for internal database maintenance was not "unreasonably high" and GSA solicited revised proposals from both offerors with regard to those CLIN's that it considered high or low.

■ At bottom, Biospherics' real complaint is not that GSA erred in failing to advise Biospherics that its price for internal database maintenance was too high in comparison to the IGCE, but rather, that GSA failed to advise Biospherics that Aspen's price was so much lower. Although Biospherics disputes this characterization of its argument, the court is at a loss to see how Biospherics could have achieved the significant price reduction it needed to be competitive without being told that Aspen had proposed a different approach to the task. As Biospherics recognizes, the FAR prohibits an agency from revealing an offeror's price proposal to another offeror without that offeror's permission. *See* 48 C.F.R. § 15.306(e)(3) (2000). Moreover, "[a]gencies are not obligated to discuss areas in which an offeror's proposal is acceptable but inferior to that of another offeror." *Atlantic Research Corp. v. Department of the Air Force,* 716 F.Supp. 904, 907 (E.D.Va.1989); *see also Labat–Anderson,* 42 Fed.Cl. at 835 (holding that agencies are not obligated to conduct all-encompassing discussions that address all inferior or inadequate aspects of a proposal). GSA was not free to tell Biospherics that Aspen was using a different staffing approach to reduce its costs. FAR 15.306(e)(2) prohibits GSA from revealing an offeror's technical solution. GSA would have acted improperly had it revealed to Biospherics that its price was significantly higher than Aspen's or that its staffing approach was less efficient than Aspen's.

■ Finally, Biospherics' contention that GSA's discussions with Aspen regarding internal database maintenance were improper and prejudicial to Biospherics is also without merit. GSA conducted discussions with Aspen after reopening discussions, on March 2, 2000, to ensure that Aspen's proposal exhibited cost realism for maintenance of the internal database. To assist in this effort, GSA

initiated discussions with Aspen to confirm that Aspen could perform the work provided in its technical proposal at the price proposed in its price proposal. *See East/West Indus., Inc.*, Comp. Gen. B–278734, B–278734.4, May 28, 1998, 98–1 CPD ¶ 143, at 4–6 (finding that the agency reasonably used a price analysis and technical reevaluation to determine that the awardee understood the contract requirements, notwithstanding its low price). There is nothing in the record to suggest that GSA's discussions with Aspen were designed to encourage Aspen to revise its proposal to make it technically acceptable. As noted above, GSA had already determined, in its December 6, 1999 Final Evaluation Report, that Aspen's proposal was technically acceptable. *See supra* at 4.

Indeed, the March 4, 2000 memorandum by GSA's technical evaluation chairman, makes plain that GSA found Aspen's approach technically acceptable before Aspen added additional staff to internal database maintenance. Aspen's proposal to increase its staffing simply added more value; it was not needed to make the proposal acceptable. *See supra* at 7. In addition, GSA's contemporaneous notes reveal that GSA was "not asking Aspen to change their price but to support their price." In fact, contrary to Biospherics' suggestion, there is no basis on this record to conclude that Aspen would not have received the award without its staffing increase. In such circumstances, Biospherics has not shown how it was prejudiced by GSA's discussions with Aspen.

### B. *GSA's conclusion that Aspen's proposal was "technically acceptable" was reasonable*

Biospherics contends that the Aspen award should be set aside because GSA was arbitrary in its determination that Aspen's proposal was technically acceptable. Biospherics contends that GSA failed to explain how it reasonably concluded that Aspen can perform the necessary internal database maintenance at such a low cost, when GSA did not have a baseline measurement or standard for the minimum amount of effort needed to maintain the database. Without this base-line, Biospherics contends, GSA's decision had no rational basis.

"Technical ratings are aspects of the procurement process involving discretionary determinations of procurement officials which a court should not second guess." *Hydro Eng'g, Inc. v. United States*, 37 Fed.Cl. 448, 467 (1997) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996)). The record shows that GSA thoroughly evaluated both proposals for both technical merit and price. The fact that GSA used the current contract with Biospherics as its baseline does not mean that GSA could not reasonably conclude that Aspen's proposal, which utilized a different approach, was technically acceptable. GSA found Aspen's proposal technically acceptable and then, confirmed that Aspen could do the work for the proposed price based on the discussions it had with Aspen, which included Aspen's responses to GSA's questions.

GSA's course of action is supported in this regard. For example, in *Jonathan Corp.*, Comp. Gen. B–251698.3, B–251698.4, May 17, 1993, 93–2 CPD ¶ 174, at 14, the GAO concluded:

> [w]here, as here, the government estimate is not revealed to offerors and proposals substantially deviate from that estimate, the contracting agency should consider the possibility that the proposals may, nevertheless, be advantageous to the government and conduct discussions with the offerors concerning the discrepancy.

(citations omitted). The GAO sustained the protest in *Jonathan Corp.* because the agency awarded the contract without conducting discussions, even though the agency had questions about the offerors' price proposals. *See id.* at 15. Here, the agency's price analysis indicated that Aspen's price substantially deviated from the IGCE and the agency properly conducted discussions and a reevaluation of Aspen's proposal to ensure that Aspen understood the contract requirements.

From the outset, Aspen made clear in its proposal and in discussions that it did not view database maintenance as a completely separate task from the other tasks assigned to its Research Specialists. * * * Aspen further elaborated how its approach would

work in the March 2, 2000 discussions with GSA and in its March 3, 2000 letter to GSA. *See supra* at 6–7. * * * Aspen further explained that it relied on its previous experience. * * * As set forth in the memorandum by GSA's technical evaluation chairman, GSA evaluated Aspen's explanation and concluded that Aspen's approach was reasonable and consistent with its technical proposal. *See supra* at 7.

The court cannot conclude, on this record, that GSA was unreasonable in its determination that Aspen's approach to internal database maintenance is technically acceptable. While it is true that Aspen added * * * more staff members [12] to internal database maintenance in response to its discussions with GSA, Aspen's approach to the contract requirements remains very different from Biospherics' approach. This distinction is at the core of the price difference between the two proposals. Even with the additional staff, Aspen's proposal for internal database maintenance is still * * * less than Biospherics' proposal for the same CLIN.

 The only evidence that Biospherics has put forth in support of its contention that the agency could not have reasonably concluded Aspen's proposal was technically acceptable is that Aspen's approach did not mirror the staffing plan in the IGCE or Biospherics' approach. "A protester's mere disagreement with the agency's evaluation is not itself sufficient to establish that the evaluation was unreasonable." *See Cube Corp. v. United States,* 46 Fed.Cl. 368, 386 (2000) (quoting *Technical & Admin. Servs. Corp.,* Comp. Gen. B–279828, July 24, 1998, 98–2 CPD ¶ 85, at 3); *ATJ & Assocs.,* 2000 CPD ¶ 60, at 8. Biospherics may believe that its approach is best. However, that does not establish that Aspen's * * * approach, along with the other differences in its proposal, is not equally viable or that GSA was unreasonable in concluding that Aspen's approach is acceptable.

 To the contrary, as noted above, the record establishes that GSA questioned As-

pen's different approach, evaluated their explanation, and reasonably concluded that Aspen's approach was acceptable. Biospherics' suggestion that Aspen's approach may not provide the same level of effort as proposed by Biospherics, and therefore the offerors may not have been competing for the same work, is not supported by the record. There is no evidence that Aspen's proposal does not provide the same service as provided by Biospherics, albeit, Aspen's price is more competitive by virtue of the reduced level of staffing Aspen was able to achieve * * *.

The court has no reason to question GSA's technical judgment that Aspen is capable of successfully operating the FIC in accordance with the contract requirements. *See Cube Corp.,* 97–2 CPD ¶ 92, at 6 (holding that, where proposal is found technically acceptable, court will not review allegation that offeror is not providing the required level of effort absent a showing of bad faith). In these circumstances, the court will not substitute its judgment for that of GSA, that both Aspen's October 1999 proposal and March 2000 revisions were technically acceptable. *See ATJ & Assocs.,* 2000 CPD ¶ 60, at 8 (holding that protester's disagreement with agency's business judgment is no basis to find agency's conclusions objectionable, where agency raised the issue during discussions and received an explanation that it concluded was reasonable).

## IV. Conclusion

Based on the foregoing, the court concludes that GSA's procurement decision was not arbitrary, capricious, or otherwise contrary to law. Accordingly, Biospherics' motion for judgment on the administrative record and request for a permanent injunction is **DENIED** and judgment for the United States and Aspen is **GRANTED**. Each party shall bear their own costs.

---

**12.** Aspen's revised technical proposal, submitted March 14, 2000, provided for * * * research specialists and * * * data entry clerks to support the database maintenance efforts of the research

specialists. The revised proposal also increased * * * the number of Information Specialists * * *.