RYDER MOVE MANAGEMENT,
INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Associates Relocation Management Company, Inc., Cendant Mobility, Interstate Relocation Service, Inc., and the Pasha Group, Intervenors.

No. 00–599C.

United States Court of Federal Claims.

Original Opinion Filed Under
Seal on Dec. 15, 2000.

Filed Jan. 3, 2001.

Andrew R. Plump, Washington, D.C., for plaintiff. Ralph L. Kissick, Richard P. Schweitzer, and Jeffrey A. Morse, of counsel.

Richard P. Schroeder, U.S. Department of Justice, Washington, D.C., with whom were David W. Ogden, Assistant Attorney General, Director David M. Cohen, and Assistant Director Todd M. Hughes. Major Scott Reid, U.S. Army Litigation Division, of counsel.

James J. McCullough, for intervenor Associates Relocation Management Co., with Steven A. Alerding, of counsel; William L. Bransford for intervenor Cendant Mobility; John A. Howell for intervenor Interstate Relocation Service, Inc., with Mark D. Poindexter and Anne K. Shukis, of counsel; Alan F. Wohlstetter for intervenor The Pasha Group, with Stanley I. Goldman, of counsel.

## OPINION

FIRESTONE, Judge.

This post-award bid protest comes before the court on the parties' cross motions for judgment on the administrative record. Plaintiff Ryder Move Management, Inc. ("Ryder"), an unsuccessful offeror, challenges the award of seven contracts by the Department of Defense ("DoD") for move management services. The procurement is part of DoD's Full Service Moving Project. Under the contracts awarded pursuant to this solicitation, move management companies will provide commercial relocation services to DoD service members. Ryder seeks to enjoin DoD from proceeding with the contract awards and to have DoD reopen the competitive bid process on the grounds that DoD failed to properly conduct the procurement.

On October 4, 2000, Ryder filed its original complaint in this action seeking declaratory

and injunctive relief. On October 10, 2000, the court granted the motion of The Pasha Group ("Pasha") to intervene, and on October 12, 2000, the court granted the motions of Associates Relocation Management Company, Inc. ("Associates"), Cendant Mobility ("Cendant"), and Interstate Relocation Services, Inc. ("Interstate") to intervene. All intervenors are contract awardees. Ryder filed its amended complaint on October 10, 2000, and a motion for preliminary injunction on October 13, 2000.

By order dated October 5, 2000, the court, after conferring with the parties, established a briefing schedule so that the preliminary injunction could be consolidated with resolution of the case on the merits. DoD has committed not to issue any work orders to any of the intervenors under the seven contracts until at least January 5, 2001. Briefing was completed on December 7, 2000, and the court heard oral argument on December 11, 2000.

## I. FACTS

### A. Pre-solicitation Activities

On June 4, 1997, DoD decided to develop and implement a plan to streamline and simplify the management of service member household moves. This newly-implemented program was called the Full Service Moving Project ("FSMP"). On September 4, 1998, the Army Communications Electronics Command ("CECOM") was selected to craft and implement the FSMP acquisition strategy.

From the beginning of the FSMP, DoD worked with representatives from the relocation, moving and storage, and freight forwarding industries (collectively, "the industry") to help shape the FSMP. As part of that effort, DoD conducted several pre-solicitation meetings with industry representatives to gather their views and provide them with information. With respect to the financial matters at issue in this litigation, there were several discussions regarding DoD's plans to evaluate the "financial status" of potential offerors on the contract. DoD informed the industry early on that it planned to use Dun & Bradstreet ("D & B") to provide financial analysis for use in the FSMP contract award process.

At the pre-solicitation conference on February 16, 2000, the contracting officer, Robin Baldwin, explained the decision to employ D & B's services as follows:

[The][i]ndustry has said to us, "we're concerned that you're going to be doing business with firms that are not financially able." We listened. We said all right. It may be viewed that if the government reviews financials there may be some bias on the part of the government. We'd like to tell you there's no bias. Everybody has the same opportunity. So what we've done to alleviate industry concerns is we've hired D & B, a recognized leader in the field, to do this for us, just as they would for any of their commercial customers. And this is being done—D & B is doing this today for the General Services Administration and other government organizations.

A.R. 119. A representative of D & B also addressed the attendees and offered prospective FSMP offerors the opportunity to review the information that D & B had on file for each company by either calling D & B or by visiting the company's website. A.R. 186.

Following the pre-solicitation conference, DoD further elaborated on D & B's role in response to an industry question about the factors D & B would take into account in its analysis. In one of a series of letters addressing industry questions that was sent to prospective offerors between February 17, 2000, and March 6, 2000, DoD explained:

The financial risk assessment will entail a comparison of the bidder's financial information submitted as part of its financial statement or tax return to companies in its "peer" group and a review of data that D & B has available in its database. *This peer group will be based upon similarly sized businesses in the bidder's primary SIC* [Standard Industrial Classification] (the one from which it derives the most revenue), as listed in the D & B database.

A.R. 360 (emphasis added).[1]

## B. The Move Management Solicitation

On March 9, 2000, CECOM issued two competitive Federal Acquisition Regulation ("F.A.R.") Part 12 commercial item solicitations to form the FSMP procurement. One solicitation, No. DAAB07–00–R–N702, was for household goods transportation services. The other, DAAB07–00–R–N703, was for move management services associated with those shipments ("move management solicitation" or "solicitation"). The latter, the move management solicitation, is the solicitation at issue in this action.

With respect to the move management solicitation, each offeror was required to submit a multi-volume proposal including: Volume 1: Past Performance/Experience; Volume 2: Financial Data—Corporate Tax Return or Accountant Prepared Year End Statement; Volume 3: Overall Technical Proposal; Volume 4: Technical Statement of Requirements Proposal; Volume 5: Price Proposal; and, Volume 6: Small Business Subcontracting Plan.

The FSMP solicitation provided a description of the factors and subfactors that would be evaluated, and the basis upon which the award would be made. *See* Evaluation Criteria—Commercial Items, A.R. 459–62. Offerors were advised that "[a]ny award(s) to be made will be based on the best overall (i.e., best value) proposal that is determined to be the most beneficial to the Government, with appropriate consideration given to the four evaluation factors: Overall Performance Risk, Technical, Statements of Requirements, and Price." A.R. 459. The "overall performance risk" factor consisted of two subfactors of equal weight: "past perfor-

mance risk" and "financial risk." Potential offerors were informed via the solicitation that the overall performance risk factor would be the most significant factor. A.R. 459.

In the March 9, 2000 solicitation, the financial risk subfactor was defined to include an assessment of the offerors' "profitability, liquidity, and solvency." A.R. 459. This subfactor is the focus of this litigation. The move management solicitation as a whole was amended six times. A.R. 596, 597, 608, 619, 638, 641. Amendment 0003 to the solicitation was issued on April 18, 2000, and added more detail regarding the information to be submitted by offerors for the financial evaluation:

> All financial statements submitted must be unique to the legal offering entity ... unless the offeror is also a corporate parent, in which case, a consolidated financial statement (offeror and its subsidiary units) is acceptable. If an offeror is a subsidiary and submits a consolidated financial statement, the offeror must submit its own individual financial information as well. If individual financial information for the subsidiary is not available with the consolidated financial statement, a debt guarantee letter from the parent company is required.[2]

A.R. 613–14.

## C. Move Management Proposals

DoD received twenty-one proposals in response to the FSMP solicitation. Under the terms of the solicitation, companies were to submit separate bids for each of ten Statements of Requirements ("SORs") Origin Areas. The SORs were for ten individual mili-

---

1. The contract between D & B and DoD explains that D & B was responsible for providing a "Critical Supplier Analysis Report" for each offeror selected for evaluation. The Critical Supplier Analysis Report was to be a "comprehensive business profile prepared by an experienced industry-specific analyst using D & B information." A.R. 392. The purpose of the report was "to provide an overall risk assessment of a supplier, with an overview summarizing the supplier's financial condition." *Id.* The report also was intended to provide "an industry overview, payment analysis & trends, special events, suits, lien judgments and other information." *Id.*

2. As part of its offer, Ryder submitted a "performance guarantee" letter from its parent company, Budget Group, Inc. At least one intervenor, Interstate, alleges that this submission is not the same as a "debt guarantee letter" as required by Amendment 003, and therefore Ryder's offer was deficient under the solicitation. Because the government never challenged this aspect of Ryder's offer, it has not been considered by the court.

tary areas where the move management services would be performed.[3] Following a review of the twenty-one proposals, DoD selected fifteen companies, including Ryder, for inclusion in the competitive range. Many of the offerors, like Ryder, had submitted bids for several of the SORs.

### D. Ryder's Proposal

Ryder submitted a proposal for seven of the ten SORs provided for under the solicitation. In its proposal, Ryder stated that it was submitting the financial data of its parent company, Budget Group, Inc. ("Budget Group"), because Ryder did not have "separate public financial statements." A.R. 806.

In a letter to D & B dated February 8, 2000, Thomas L. Kram, Budget Group's vice president and controller, stated that Ryder was bidding on the FSMP, that Ryder lacked "stand-alone public financial statements," and that Budget Group intended to submit its financial data as part of the documentation requested for the financial risk assessment process. A.R. 895. Ryder subsequently submitted the "1998 Budget Group Owner's Manual." A.R. 812–894. This document, which was Budget Group's annual report to its shareholders, contained a copy of Budget Group's audited financial statements.

### E. The D & B Report

Based on Budget Group's financial information submitted by Ryder and additional information otherwise available to D & B, D & B prepared a report, the "Critical Supplier Analysis Service" for Ryder, dated May 19, 2000. A.R. 1158–79. The report noted that Ryder derives 100% of its income from activities characterized as "local trucking and storage," categorized as Standard Industrial Classification ("SIC") code 4214. A.R. 1165. Because Ryder was the offeror on the solicitation, D & B compared the financial data submitted for Budget Group with that of other companies in Ryder's SIC code, 4214.[4] Budget Group, Ryder's parent, is in a different SIC.

Based on its review of Budget Group's financial statements, D & B concluded that the offeror, Ryder, presented a "moderate" financial risk. A.R. 1160. Specifically, D & B's report stated that the consolidated financial statement submitted by the parent company, Budget Group, reflected "a moderate solvency position highlighted by a satisfactory liquidity position and a fair leverage ratio." A.R. 1160, 1163. The report demonstrated that Budget Group sustained a net loss for the year ending December 31, 1998: Budget Group's financial statement revealed that it had sustained a net operating loss after taxes of $48,927,000 based on gross revenues of $2,616,199,000, resulting in a loss of 1.8%. A.R. 837. The D & B report further stated that this "1.8% net margin loss . . . compared unfavorably to the industry norm" of +2.4%. A.R. 1163, 1169. The D & B report also noted that "the parent company's total debt to equity ratio was 644%," which D & B considered "fair" compared to the industry norm of 103.1%. A.R. 1163, 1170. D & B derived this information from Budget Group's financial statements showing a ratio of total liabilities of $4,192,321,000 versus stockholder equity of $650,590,000. A.R. 837.

Ryder was not the only offeror for which D & B used the parent company's data for evaluation purposes. Two of the intervenor contract awardees, Associates and Cendant, had, like Ryder, submitted only financial

---

**3.** The ten SORs were all within Georgia, North Dakota and the National Capital Region: SOR1—Fort McPherson and Naval Supply Corps School, Athens; SOR2—Fort Gordon; SOR3—Fort Stewart (including Hunter Army Airfield); SOR4—Marine Corps Logistics Base, Albany and Moody Air Force Base; SOR5—Fort Benning; SOR6—Anacostia Naval Station, Pentagon, Henderson Hall, and Bolling Air Force Base; SOR7—Fort Meade, United States Naval Academy, Walter Reed Army Medical Center, and U.S. Coast Guard Headquarters; SOR8—Marine Corps Combat Development Command, Quantico, Naval Surface Weapons Center, Dahlgren,

and U.S. Navy Sugar Grove; SOR9—Fort Belvoir and Andrews Air Force Base; and, SOR10—Minot Air Force Base. A.R. 2714–15.

**4.** The report did not address whether any of D & B's conclusions would have been different if it had compared Budget Group's financial statements with those of other companies that also derived the bulk of their income from automobile rental activities, a comparison that would have required D & B to use another SIC code to evaluate the financial data.

data from their parent companies and not from their own subsidiary units. D & B compared these two parent companies' data to the financial norms established by other companies in the offerors' primary SIC code categories, even though it was their parent companies' data being used (and the parent companies had SIC codes different than the offerors). These comparisons nonetheless showed that the parents' financial data demonstrated a "low" financial risk result for both Associates and Cendant.

### F. The Contracting Officer's Evaluation of Ryder's Proposal

Pursuant to the F.A.R., from June 8, 2000, through August 7, 2000, the contracting officer conducted discussions with Ryder. These discussions were documented as "Items for Negotiation/Communication" ("IFNs"). A.R. 1014–93. Fifteen IFNs were related to technical factors within Ryder's proposal, fourteen were related to SORs, and two were related to price. None were related to D & B's conclusion that Ryder presented a "moderate" financial risk. *Id.*

DoD evaluated Ryder's proposal, including the associated financial risk, in three stages: initial (July 2, 2000), interim, and final. At each stage, DoD evaluated both Ryder's financial risk and overall performance risk as "moderate." A.R. 1103, 1119, 1140. In reaching this conclusion, the DoD contracting officer concurred with D & B's determination that Ryder presented a "moderate solvency position, highlighted by a satisfactory liquidity position and an unfavorable leverage ratio." A.R. 1140. The contracting officer noted that the information Ryder submitted reflected a debt to equity ratio of 644%, which she considered "fair" when compared to an industry norm of 103.1%. She found that Budget Group sustained a net loss for the year ending December 31, 1998, although she noted an upward trend, and she determined that Budget Group's 1.8% net

loss margin compared unfavorably to an industry norm of +2.4%.[5] The 1.8% net loss and the debt to equity ratio of 644% were consequently listed as specific disadvantages against Ryder in the contracting officer's "Narrative Rationale for the Rating Assigned." A.R. 1140. Ryder was therefore given an overall "moderate" rating for the most important category, the overall performance risk factor. The "Source Selection Decision Document" explains that "moderate risk" means "some doubt exists based on the Offeror's performance and/or financial record that the Offeror can perform the proposed effort." A.R. 2717. Outside of the financial evaluation, Ryder received favorable ratings in the other three factors: technical, SORs, and price.

### G. Final Evaluation and Awards

The contracting officer, the source selection authority for the solicitation, determined on August 24, 2000, that the proposals submitted by Parsifal Corporation, Suddath Van Lines, Pasha, Interstate, Allied Van Lines, Cendant, and Associates provided the best overall value to the government and accordingly awarded contracts to each for various SORs.[6] The contracting officer only made awards to those companies that had received "low" risk ratings as their overall performance risk factors.

In her final evaluation, the contracting officer stated that, after having evaluated each of the competitive range offerors for award, she determined that those with "moderate" overall performance risk should be eliminated from further consideration. The analysis is set out in DoD's Source Selection Evaluation Board ("SSEB") "Consensus Evaluation Document" for Ryder, in the section titled, "Narrative Rationale for the Rating Assigned," A.R. 1103, and in the Source Selection Decision Document. A.R. 2714–30.

---

5. In the "Source Selection Decision Document," the contracting officer erroneously compared Ryder's loss to an industry norm of +7.0% instead of +2.4%. This error was the result of a typographical error. *See* discussion, part I.I., *infra*.

6. Cendant received a contract award for three of the ten SORs, Interstate received a contract award for two of the SORs, and Associates, Allied Van Lines, Parsifal Corporation, and Pasha each received a contract for one SOR. A.R. 2722–23.

## H. Ryder Debriefing

The contracting officer informed Ryder that it had not been selected for an award under the solicitation on August 25, 2000, by telephone, and on August 27, 2000, by letter. A.R. 752–754. The contracting officer conducted Ryder's post-award debriefing by telephone on August 30, 2000, and she transmitted debriefing charts to Ryder via electronic mail and facsimile prior to the debriefing.

At the debriefing, the contracting officer explained that she had not considered Ryder for any award because it had been given a "moderate" overall performance risk rating. The debriefing materials stated: "In making my award decision, [some] Offerors [including Ryder] ... did not receive further consideration for award because they were not rated Low Risk in the Overall Performance Risk Factor, the most important Factor." A.R. 2726.

## I. Proceedings Before the GAO and This Court

On September 5, 2000, Ryder submitted a protest to the General Accounting Office ("GAO") challenging the contract awards for the seven SORs for which it was an unsuccessful offeror. On September 14, 2000, Ryder withdrew its GAO protest. Thereafter, Ryder commenced the present action. On October 10, 2000, the court granted the motion of Pasha to intervene, and on October 12, 2000, the court granted the motions of Associates, Cendant, and Interstate to intervene.

In its amended complaint and motion for preliminary injunctive relief, Ryder makes four contentions. First, Ryder contends that the DoD contracting officer was arbitrary and capricious in her evaluation of Ryder's financial condition. Ryder argues that a proper comparison of Budget Group's financial data with other car rental companies and a proper evaluation of Budget Group's financial statements would have shown that Ryder does not present a "moderate" financial risk factor. Second, Ryder contends that the contracting officer failed to conduct meaningful discussions with Ryder in failing to raise any concerns about Budget Group's alleged financial weaknesses during her discussions with Ryder, thereby violating F.A.R. §§ 15.305(a) and 15.306(c). Third, Ryder asserts that even with a "moderate" overall performance risk rating, Ryder's offer should have been evaluated as part of the best value tradeoff analysis. Ryder contends that DoD erred in only evaluating offers with "low" ratings in the overall performance risk category in its best value tradeoff analysis. And fourth, Ryder contends that the contracting offer did not fairly evaluate Ryder's proposal, violating F.A.R. § 1.102–2(c)(3), because she gave Pasha a "low" overall performance risk rating, even though Pasha also had received a "moderate" financial risk subfactor rating from the contracting officer.[7]

In support of its first and principal contention, Ryder submitted the affidavits of Gale Monda and Thomas L. Kram to show that if D & B had properly compared Budget Group's financial data to that of other companies in the car rental business, it would have concluded that Budget Group's debt to equity ratio is within the range of other car rental companies' debt to equity ratios. In particular, Mr. Kram contends that if Budget Group's debt is adjusted to account for some exceptional items,[8] its debt to equity ratio

---

**7.** The D & B report on Pasha states that Pasha "is a well established business with an overall satisfactory financial condition. The company's solvency position is satisfactory as evidenced by satisfactory liquidity and leverage ratios. The company is profitable and a satisfactory net profit margin was in evidence. The overall risk assessment for Pasha Group is low based on the longevity of operations, the satisfactory financial condition and a favorable past performance report." A.R. 2682. The DoD evaluation concludes, based on the D & B report, that while Pasha may be a moderate financial risk, its financial condition is satisfactory "because the pre-ponderance of significant ratios fall near the comparable industry norms." A.R. 2657. The final evaluation notes that Pasha's profitability is an "advantage" and led the contracting officer to conclude that Pasha deserved a "low" overall performance risk factor rating.

**8.** Mr. Kram argues that Budget Group's financial data should be "properly restricted for cash accounts" to reflect the acquisition of rental automobiles and rental office locations, debt extinguishment costs, etc.

was 493%, a number that compares more favorably with adjusted debt to equity ratios for Hertz Rental Cars at 413.2% and Avis at 462.8%. Mr. Kram further asserts that had D & B properly read Budget Group's financial statements, it would have understood that most of the loss was attributable to certain one-time events, and that if those events were eliminated as well as certain other losses, Budget Group would have shown a slight profit.[9] Mr. Kram does not allege that Budget Group's profitability compares favorably to other companies in its SIC code, and Ryder has presented no evidence as to the profitability of others in its SIC code. Instead, Ryder takes issue only with the debt to equity ratio comparisons.

In response, the government and intervenors argue that the contracting officer's decision was not arbitrary or capricious and was made in accordance with all applicable regulations. In addition, on December 7, 2000, as part of its reply, the government filed the declaration of the DoD contracting officer in this matter, Robin A. Baldwin. The declaration addresses two topics related to her evaluation of FSMP offers. First, Ms. Baldwin summarizes the approach she used in evaluating the factors and subfactors presented by each offeror. In response to Ryder's contention that DoD failed to perform a proper best value tradeoff analysis, Ms. Baldwin explains that she "performed a trade-off analysis which encompassed each of the proposals—including plaintiff's [Ryder's] proposal—within the competitive range for each of the 10 individual Statements of Requirements. In doing so, I considered the Overall Performance Risk Factor assessment, the Technical and Statement of Requirements Factor ratings and the evaluated price for each offeror."

Second, Ms. Baldwin corrected a transcription error that appeared in several places in the administrative record. Where-

as the government's evaluation documents (e.g., the "Source Selection Evaluation Board Consensus Evaluation Document" for Ryder) contain the statement that Ryder's net loss margin of 1.8% compared unfavorably to an industry profit norm of +7.0%, that industry number should have been +2.4%. Ms. Baldwin explains that "[t]he 7.0% figure was mistakenly taken from the median 'return on assets' figure, which is listed immediately below the 2.4% 'return on sales' entry in D & B's Critical Supplier Analysis Service report." A.R. 1103, 1119, 1138. The proper number was used by D & B in its analysis, see A.R. 1169, and this error apparently does not affect the "moderate" financial risk or overall performance risk ratings given to Ryder.[10]

## II. DISCUSSION

### A. Scope and Standard of Review

■ The court's jurisdiction over post-award bid protest actions is provided for by the Tucker Act, 28 U.S.C. § 1491(b)(1) (1994 & Supp.1999). Pursuant to the Tucker Act, review of a post-award bid protest action is based on the administrative record developed before the relevant contracting agency. *Cubic Applications, Inc. v. United States*, 37 Fed.Cl. 339, 342 (1997). The Tucker Act further provides that the court is to apply the standard of review prescribed in the Administrative Procedures Act, which authorizes a court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A) (1994). *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed.Cir.1998); *Miller–Holzwarth, Inc. v. United States*, 42 Fed.Cl. 643, 649 (1999).

■ Under the above-noted standard, an aggrieved bidder has the burden to dem-

---

9. In particular, the balance sheet shows that Budget Group had a net loss of $3,631,000 before the extraordinary item loss of $45,296,000 was added. Using the former number rather than the latter would obviously result in attributing a smaller loss percentage to Budget Group for purposes of this analysis.

10. It is proper for this court to notice such a correction of the administrative record where "the inconsistency was the result of a clerical error in drafting the source selection statement" and "the record supports the contracting officer's testimony in this regard." *Technology & Mgmt. Svcs., Inc.*, Comp. Gen. B–253117, B–253117.2, Oct. 14, 1993, 93–2 CPD ¶ 226, at 3–4.

onstrate that there is no rational basis for the agency's decision. *Delbert Wheeler Constr., Inc. v. United States*, 39 Fed.Cl. 239, 247 (1997), *aff'd*, 155 F.3d 566 (Fed.Cir.1998); *Aero Corp. v. Department of the Navy*, 540 F.Supp. 180, 208 (D.D.C.1982) (holding that challenging party has a "heavy burden" of proof of irrationality). The court may not substitute its judgment for that of the agency. *IMS Servs., Inc. v. United States*, 33 Fed.Cl. 167, 179 (1995); *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983). The question before the court is not whether a contracting officer's decision was right or wrong; instead, the court "must determine whether or not the contracting officer's decision was 'the result of a considered process, rather than an arbitrary and capricious choice based on factors lacking any intrinsic rational basis or relationship to the questions at issue.'" *Keene Corp. v. United States*, 584 F.Supp. 1394, 1401 (D.Del.1984) (emphasis omitted) (quoting *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277 (5th Cir.1978)).

It is against this backdrop that the court will review the parties' and intervenors' cross motions for judgment on the administrative record.

## B. The Contracting Officer's "Moderate Risk" Financial Risk Determination Was Not Irrational

The heart of Ryder's complaint is its contention that D & B's, and hence the contracting officer's, conclusion that Ryder presented a "moderate" financial risk was irrational. Ryder argues that the contracting officer's conclusion was irrational because it was based on a "flawed" analysis of Budget Group's financial statements by D & B. Ryder contends that D & B erred by: 1) failing to compare Budget Group's financial ratio to

the proper peer group; and, 2) failing to give Ryder credit for certain positive aspects of Budget Group's financial statement. In its brief, Ryder states that it was simply "irrational" for the contracting officer to conclude that Ryder, which was "backed with evaluation-year assets of $5.1 billion, revenues of $3 billion, and cash on hand of over $550 million," deserved a "moderate" financial risk rating.

■ As noted at the outset, the court has a very limited role in reviewing the contracting officer's decision. The court may not itself re-weigh the evidence presented to the contracting officer. *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971). Rather, the court's role is limited to determining whether, taking the record as a whole, the contracting officer's conclusion that Ryder presented a "moderate" financial risk was rational and supported.

■ Despite the errors Ryder attributes to the D & B analysis, the court concludes the contracting officer was not "irrational" in relying on D & B's evaluation in reaching her decision that Ryder presented a "moderate" financial risk rating. First, the court is persuaded that D & B did not err by comparing Budget Group's financial data to that of companies in Ryder's SIC category. The offerors were told that D & B would be comparing their financial information to that of others in the *offerors'* primary SIC category.[11] A.R. 360. Ryder was undisputably the "offeror," and D & B reasonably believed, based on Ryder's submission of Budget Group's data, that this data reflected Ryder's financial position. Because Ryder did not have separate financial data, the Budget Group data was the best indication of Ryder's financial risk.[12]

---

**11.** DoD acted consistently in this regard. Ryder was not the only bidder on the FSMP to submit financial data from its parent company; D & B reviewed parent company financial data from both Cendant and Associates as well. In each case, D & B compared the parent company's financial data to the data of companies in the bidder's, and not the parent's, primary SIC category. Ryder was treated no differently than other bidders, reducing Ryder's claim that it was improperly singled out and harmed by D & B's, and consequently DoD's, analytical approach.

**12.** The government here argues that Ryder is barred from contesting D & B's/DoD's methodology by laches. The court disagrees. There is possibly a waiver argument to made given Ryder's failure to challenge the terms of the solicitation itself in a timely fashion, *Synetics, Inc. v. United States*, 45 Fed.Cl. 1, 13 (1999) ("If plaintiff found ... the RFP unclear or ambiguous ... it should have raised the issue prior to submitting its bid."), but because this court concludes that Ryder's claim fails as a matter of law, it is unnecessary to reach this issue.

Second, D & B's comparison of Budget Group's unfavorable financial data to that of Ryder's peer companies is not the dispositive factor in this case, even if the comparison of Budget Group's data to the data of companies in Ryder's SIC category was inappropriate.[13] Rather, the dispositive factor here is that Budget Group's financial data is itself unfavorable. As described in the solicitation, each offeror was evaluated for liquidity, solvency, and profitability. Budget Group's 1.8% net margin loss and 644% debt to equity ratio are patently problematic. A loss of 1.8% is a loss, no matter how small the profit margin enjoyed by other companies in the same category. Similarly, a high debt to equity ratio is a key factor in determining financial risk, regardless of whether others in a company's peer group are also highly leveraged.

For this reason as well, D & B's analysis is not irrational simply because D & B failed to perform a "more sophisticated" analysis of Budget Group's financial picture, as Ryder alleges. *Harvard Interiors Mfg. Co. v. United States,* 798 F.Supp. 565, 571 (E.D.Mo. 1992) ("Plaintiff has demonstrated that [the government's] analysis could have been more detailed and more sophisticated; plaintiff has failed to establish, however, that the analysis, and the resulting no-award recommendation, lacked a rational basis."). Given that profit margin and debt to equity ratio are two of the most common measurements of a company's financial health, Ryder's assertion that its 1.8% net loss and 644% debt to equity ratio are somehow misleading is simply untenable.[14] D & B's own guidance documents explain these two key measures of financial strength as follows:

Return on Sales (Profit Margin)—Ratio measures the profits after taxes on the year's sales. The higher this ratio, the better prepared the business is to handle downtrends brought on by adverse conditions; Measures the efficiency of the operation.

Total Liabilities to Net Worth—Compares the company's total indebtedness to the venture capital invested by the owners. High debt levels can indicate greater risk; The higher this ratio, the less protection there is for creditors of the business.

A.R. 412, 414, 1179.

Similarly, Ryder's argument that Budget Group's size entitled it to special treatment under D & B's analysis is without merit. The fact that Budget Group may be larger than other companies and therefore may possess certain beneficial financial attributes does not mean that D & B arbitrarily concluded that Ryder presented a "moderate" versus a "low" financial risk, based on Budget Group's net loss and high debt to equity ratio. Even Fortune 500 companies are susceptible to market forces and, if they are too highly leveraged, can face financial risks.

In this connection, the court also recognizes that D & B is a recognized leader in the field of evaluating the financial strength of companies, and is known as an independent reporting service that is frequently used by government contracting officials. A.R. 184–85 (D & B has had "over 150 years of experience making these types of [credit evaluation] decisions.... It's a standardized, comprehensive evaluation process."); *International Shipbuilding, Inc.,* Comp. Gen. B–257071.2, Dec. 16, 1994, 94–2 CPD ¶ 245, at n. 2.

Moreover, even if D & B's evaluation was not perfect, Ryder has failed to show how D

---

13. In fact, there is nothing in the solicitation demanding the comparison provided by D & B. As explained by the government at oral argument, the purpose of the comparison was actually to assist offerors by comparing their data to that of peers within their same industry group, to provide context regarding the environment in which those offerors compete.

14. For example, Ryder asserts that "Budget's debt to equity ratio should have been adjusted for restricted cash accounts and the significance of financing of vehicles should have been recognized in the evaluation of this ratio; and Bud-

get's balance sheet profit/loss statement should, among other things, have been evaluated in light of one-time charges and other non-recurring expenses." As recognized by Ryder, a mere difference in opinion regarding the appropriate analytical approach does not provide sufficient grounds to justify overturning the contracting officer's decision as irrational. Pl.'s Mem. Opp'n Mot. J. at 15. Here, the knowledgeable evaluative process employed by D & B is akin to an "opinion regarding the appropriate analytical approach," and nothing in the administrative record provides a reason to reject it.

& B's evaluation was plainly wrong. *Harvard Interiors*, 798 F.Supp. at 571 ("[T]he Court is not called upon to determine whether plaintiff's expert was right, and [the government] wrong, concerning plaintiff's financial ability to perform the ... contract.... [The government's] error does not require overturning plaintiff's rejection unless GSA failed to consider all relevant factors and articulate a rational connection between the facts and the choice made."). Under the applicable standard of review, the court does not have to find that the contracting officer's conclusion, based on D & B's analysis, was correct beyond all doubt in order to sustain the contracting officer's decision. *Id.* Rather, in order to reverse the contracting officer's decision, the court would have to find that the contracting officer's conclusion regarding Ryder's financial risk is irrational or wholly unsupported. *Baird Corp.,* 1 Cl.Ct. at 664. Given the undisputed facts from Budget Group's own financial statements, the contracting officer's decision is adequately supported.

Finally, Ryder has not demonstrated that it would secure a "low" financial risk rating even if Budget Group's data were compared to that of companies in Budget Group's own SIC category. Ryder has submitted affidavits showing that its financial picture could be better explained, but not that the company is in fact a "low" financial risk. In such circumstances, there is no basis upon which to conclude that D & B's evaluation was plainly wrong and that a remand to DoD to re-evaluate Ryder's financial status would change the outcome. Ryder may be able to show that other financial experts could have formed a different view, but Ryder cannot escape the fact that Budget Group has not been profitable, and has a great deal of debt.

For all of these reasons, neither D & B's nor the contracting officer's conclusion that Ryder presented a "moderate" financial risk was irrational.

## C. The Contracting Officer Did Not Err in Failing to Conduct Additional Discussions with Ryder Regarding Its Financial Condition

▇▇▇ Under the F.A.R., the contracting officer is obligated to conduct discussions with offerors in the face of potentially deficient or ambiguous information contained in that offeror's bid. *Furuno U.S.A., Inc.,* B–221814, Apr. 24, 1986, 86–1 CPD ¶ 400, at 5, 1986 WL 63429 ("[O]ne purpose of discussions is to advise offerors within the competitive range of informational deficiencies in their proposals so that they can be given an opportunity to satisfy the government's requirements."); *CACI Field Services, Inc. v. United States,* 13 Cl.Ct. 718, 731 (1987). More specifically, the F.A.R. provides that:

> [T]he contracting officer shall ... indicate to, or discuss with, each offeror still being considered for award, significant weaknesses, deficiencies, and other aspects of its proposal ... that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. The scope and extent of discussions are a matter of contracting officer judgment.

48 C.F.R. § 15.306(d)(3) (1994 & Supp.1999). In accordance with the discretion provided under the F.A.R., "[a]gencies need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others." *Biospherics, Inc. v. United States,* 48 Fed.Cl. 1, 8 (2000) (citing *Development Alternatives, Inc.,* Comp. Gen. B–279920, Aug. 6, 1998, 98–2 CPD ¶ 54, at 7, 1998 WL 546017).

▇▇▇ Because Ryder does not object to the actual data but instead challenges DoD's interpretation of the data, this case illustrates exactly the type of situation in which additional discussions are not required under the F.A.R. It is well settled that discussions are not required regarding opinions drawn from data. *Sensis Corp.,* Comp. Gen. B–265790.2, Jan. 17, 1996, 96–1 CPD ¶ 77, at 8, 1996 WL 15744 ("[A]n agency generally need not discuss matters with offerors which, by their nature, generally are not subject to correction through the discussion process."). Where, as here, the data have been submitted by the offeror, accompanied by the offeror's explanation, and the data

are not themselves in dispute, discussions are not necessary. Ultimately, both the decision to conduct discussions and the scope of any discussions are left to the judgment of the contracting officer. *Biospherics,* 48 Fed.Cl. at 8 (citing *Cubic Def. Sys., Inc. v. United States,* 45 Fed.Cl. 450, 471 (1999)).

**D. The Source Selection Authority Properly Conducted a Best Value Tradeoff Analysis**

Ryder next argues that even if Ryder remains a "moderate" overall performance risk under the FSMP solicitation, Ryder was improperly excluded from the best value tradeoff analysis required by the solicitation. The FSMP solicitation specified that contract awards would go to offerors who offered the best value to the government, a determination to be made using all four evaluation factors (from most important to least important): overall performance risk, technical, statement of requirements and price. A.R. 459.

According to Ryder, the contracting officer made a fatal error in improperly eliminating five offerors, including Ryder, from consideration in the best value added stage of the evaluation because they had received "moderate" overall performance ratings. Ryder contends that all offerors within the competitive range should have been evaluated under the best value tradeoff evaluation. As support, Ryder cites paragraph 23 of the Source Selection Decision Document:

> In making my award decision, Offerors FE, FK [Ryder], FN, FX, and FY did not receive further consideration for award because they were not rated Low Risk in the Overall Performance Risk Factor, the most important Factor. Since many of the offerors that received Low Risk ratings in the Overall Performance Risk Factor were determined to have favorable ratings in the less important Factors and Subfactors, I did not feel that it was necessary to reconsider Offerors FE, FK, FN, FX, and FY since I determined that the successful offerors provided the best value offers to the Government.

A.R. 2726. Ryder alleges that this statement proves that the contracting officer violated the terms of the solicitation by "only perform[ing] a best value tradeoff analysis for the seven offerors with 'Low' performance risk ratings." *Kathpal Tech., Inc.,* Comp. Gen. B–283137.3, B–283137.4, B–283137.5, B–283137.6 (Dec. 30, 1999), 2000 CPD ¶ 6, at 11 ("The failure to consider offerors' proposal ratings under all the stated evaluation criteria in eliminating technically acceptable proposals from the competition is not reasonable and violates the statutory requirement that proposals be evaluated under the factors stated in the solicitation.").

 In determining whether an agency has properly reached a source selection decision, "we examine the record to determine whether the agency acted reasonably and consistent with the stated evaluation factors." *Ideal Electronic Sec. Co., Inc.,* Comp. Gen. B–283398, Nov. 10, 1999, 99–2 CPD ¶ 87, at 4. The court finds that in this case, the administrative record as a whole demonstrates that the contracting officer conducted a best value tradeoff analysis as required by the solicitation for all offers in the competitive range. In paragraph 6 of the Source Selection Decision Document, the contracting officer states: "During the initial and interim evaluations, each offeror's consensus evaluation reports were considered." A.R. 2718. And in paragraph 11, the contracting officer explains:

> Based upon the final evaluation results, as reported to and discussed with me by the SSEB, I have compared the above proposals giving appropriate consideration to the evaluation factors set forth in the RFP and their relative importance.... For the full and open competition awards, I determine that the proposals submitted by Offerors FD, FF, FG, FH, FM and FR provide the best overall value in comparison to the proposals submitted by the remaining Offerors (FE, FK [Ryder], FN, FX, and FY).

A.R. 2722.

 These statements, taken together with the detailed offeror-specific Consensus Evaluation Documents produced by the SSEB, demonstrate that the contracting officer and the SSEB did fully consider all four performance criteria in performing the best value tradeoff analysis before selecting the

final FSMP contract awardees.[15] In addition, Ms. Baldwin confirmed this conclusion in her affidavit: "As a result of this trade-off analysis, I determined that the proposals submitted by offerors identified by FE, FK (Ryder), FN, FX and FY, when compared to the proposals submitted by offerors the eventual awardees ... did not warrant further consideration for award ...." While the court looks most heavily to the agency's contemporaneous record of the decision-making process, the court may "consider post-protest explanations, so long as those explanations are credible and consistent with the rationality of selection decisions." *Ideal Electronic Sec. Corp.,* Comp. Gen. B–283398 at 3. The record as a whole therefore demonstrates that the best value tradeoff analysis the contracting officer conducted was proper.

### E. The Contracting Officer's Determination Regarding Pasha Was Not Arbitrary or Capricious

 Finally, Ryder's contention that the contracting officer failed to evaluate all offers fairly must be rejected. Ryder argues that the contracting officer violated F.A.R. § 1.102–2(c)(3) by failing to "treat all prospective contractors 'fairly and impartially.'" Specifically, Ryder takes issue with Pasha's "low" overall performance risk rating as compared to its own "moderate" overall performance risk rating, since both offerors had combined subfactor ratings of "low" and "moderate" for the past performance and financial risk subfactors.

F.A.R. § 1.102–2(c)(3) provides:

The Government shall exercise discretion, use sound business judgment, and comply with applicable laws and regulations in dealing with contractors and prospective contractors. All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same.

48 C.F.R. § 1.102–2(c)(3) (1994 & Supp.1999). According to Ryder, despite the fact that Ryder and Pasha were given the same scores for the two subfactors within the overall performance risk category, when the subfactor scores were combined, Pasha was unfairly given a more favorable rating than Ryder. Ryder argues that this violates F.A.R. § 1.102–2(c)(3) because the offerors were not treated the same.

The contracting officer's determination that Pasha presented a "low" overall performance risk, even though Pasha received a "moderate" financial risk rating, is ultimately supported by the record. It is well established that contracting officers have the discretion to consider a whole host of factors in awarding government procurement contracts, and in this case, the contracting officer permissibly chose to afford more weight to the financial risk and overall performance risk components of her analysis. It is not for this court to second-guess that decision, as "judges are ill-equipped to settle the delicate questions involved in procurement decisions, where long and complex factual histories, subtle economic factors, and the need for expeditious buying decisions require assessments 'better left to the expertise of an executive agency.'" *Kinnett Dairies,* 580 F.2d at 1271 (citing *Hayes Int'l Corp. v. McLucas,* 509 F.2d 247, 258 (5th Cir.1975)).

The need for such deference is illustrated by the record in this case. Contrary to Ryder's contentions, while Ryder and Pasha were given the same ratings in the overall performance risk category, there were different analyses leading to those ratings, analyses which distinguish the offerors from one another and support the contracting officer's decision. In particular, the contracting officer identified specific "disadvantages" in Ryder's risk assessment that were not present in Pasha's assessment. In contrast to Ryder, Pasha's operations are currently profitable, and its net profit margin of * * * * * is very

---

15. Ryder alleges that for one SOR, SOR4, the contracting officer actually included an offeror that had received a "moderate" overall performance risk rating in the best value tradeoff analysis, and that offeror consequently ended up receiving the contract award. According to Ryder, this highlights the alleged prejudice suffered by Ryder under the analysis for the seven contracts on which Ryder made an offer. What Ryder fails to mention is that SOR4 represents the Small Business Set Aside contract, and as such, only two offerors bid on the contract, both of which had more than one "moderate" subfactor or factor rating. A.R. 2730.

close to the industry norm (within Pasha's primary SIC category) of +2.7%. A.R. 2657. Ryder suffered a net loss margin of 1.8% compared to its industry norm of +2.4%. A.R. 1103.[16] The contracting officer further took into account the company's differing past performance ratings (Ryder's 1.49 versus Pasha's 1.14, with 1 being the best rating) and debt to equity ratios (Ryder's 644% versus Pasha's 80.7%). A.R. 1101–03, 2657–59. The contracting officer was rational in preferring Pasha over Ryder because Pasha's financial data was superior, and the contracting officer determined that there were no disadvantages to Pasha's proposal. This led to the "low" overall performance risk rating for Pasha.

That the contracting officer did not have the same confidence in Ryder's financial future and chose to consider Budget Group's losses and high indebtedness as "disadvantages" cannot be deemed unreasonable by this court. In fact, not one of the offerors that had noted "disadvantages" in the overall performance risk analysis were given "low" risk ratings. Ryder was treated consistently with the other offerors. In such circumstances, Ryder has not shown a violation of F.A.R. § 1.102–2(c)(3).

### III. CONCLUSION

Based on the foregoing, this court finds that the contracting officer's decision was not unlawful or irrational. Accordingly, the government's motion for judgment on the record is **GRANTED** and Ryder's request for a permanent injunction is **DENIED**. Each party shall bear its own costs.

---

**16.** As corrected by Declaration of Robin A. Baldwin.